## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

ASHLEY AMARIS OVERBEY,
913 26th Street
Newport News, VA 23607

    and

BALTIMORE BREW
PO Box 5626
Baltimore, MD 21210

          *Plaintiffs*,

     v.

THE MAYOR AND CITY COUNCIL OF
BALTIMORE,
Baltimore City Hall
100 Holliday St.
Baltimore, MD 21202

and

BALTIMORE CITY POLICY DEPARTMENT
242 W. 29th St.
Baltimore, MD 21211-2908

          *Defendants*.

CIVIL ACTION NO.

   1:17-cv-1793

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

Plaintiffs Ashley Amaris Overbey and Baltimore Brew, through their undersigned attorneys, bring this action against Defendants for damages, and declaratory and injunctive relief, under the First Amendment to the United States Constitution, and for breach of contract and violation of the public policy of the State of Maryland.

Plaintiffs demand a trial by jury, and allege as follows.

## NATURE OF THE CASE

This is an action challenging as unconstitutional and otherwise unlawful the pattern and practice of the City of Baltimore and its Police Department of requiring plaintiffs resolving police misconduct complaints against City police to agree to a one-sided confidentiality agreement as a condition of settlement, and to forego recovery of half of settlement proceeds if the City unilaterally deems the confidentiality provision—or, more accurately, a gag order—to be breached.  Plaintiffs Ashley Overbey (a police misconduct victim subjected to a City gag order) and Baltimore Brew (a media organization) contend  that the gag order illegally restricts free speech, and in so doing contravenes the public's interest in police accountability and community trust in law enforcement.

## PARTIES

1.      Plaintiff Ashley Overbey is a 30-year-old mother of three, who at times relevant to this action was a resident of the City of Baltimore.  Ms. Overbey is a citizen of the United States and the State of Maryland within the meaning of the United States Constitution.  As explained below, Ms. Overbey has been injured by the Defendants' illegal policies, acts, and omissions.

2.      Plaintiff Baltimore Brew is an independent daily news website specializing in accountability reporting, focusing on campaign cash, development deals, government spending, city services, and more.   Baltimore Brew is sustained by reader-members, foundations, advertiser-sponsors, viewer donations, and earned revenue.  Baltimore Brew does not accept government or corporate funding.  As explained below, Baltimore Brew has been injured by the Defendants' illegal policies, acts, and omissions.

3.      Defendant Mayor and City Council of the City of Baltimore ("City"), a municipal corporation, is a governmental entity and a "person" within the meaning of the United States Constitution.  All of the City's acts and omissions are conducted under color of state law.

4.      Defendant Baltimore City Police Department ("Police Department" or "BPD") is a government agency.  The Mayor appoints the Commissioner of the Police Department with the advice and consent of the City Council.  The City Council holds hearings on Police Department policy and reviews the Police Department budget.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction to hear this federal civil rights case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

6.      Venue lies with this Court because the Defendants reside, carry on a regular business, habitually engage in a vocation, and maintain their principal offices in the District of Maryland, and a substantial part of the events giving rise to this cause of action occurred in the District of Maryland.  *See* 28 U.S.C. § 1391.

## BACKGROUND

### *The Scourge of Police Brutality*

7.      With the advent of mobile smart devices and social media, the epidemic of police brutality, particularly as it relates to Black communities, is no longer concealed from the public.  It is a subject that makes reasonable, decent people very uncomfortable.  It can be painful to discuss because it causes society to confront the grim reality that race relations in the United States remain complex, fraught, frequently contentious, and at times explosive.  The subject frequently stirs a sense of hopelessness, the feeling that the problem is simply too deeply ingrained in our national DNA, and that we are powerless to do anything about it.

8. Last year (2016), the frequency and seeming ubiquity of close-up recorded images on televisions and mobile devices of Black people being brutalized by police was mind-numbing, and caused the United States to confront as a society the topic of race relations between police departments and Black people.

9. The videos from Summer 2016 in particular—in Baton Rouge; in a suburb of St. Paul; and in Dallas—were an important lesson in the power of information, knowledge, and transparency. Among other images, the country (indeed, the world) saw in horrid, real-time detail the final moments of the lives of Alton Sterling and Philando Castile, among others. The public—all of us—needed to see those images; needed to be aware of those events; needed to be informed of those pivotal moments in history as they unfolded. It is the public's right to be aware of the actions of government, including police departments. As difficult as the images are, as complex as the topics of police brutality and race relations may be, it is only through the spread of information and knowledge that we, both as individuals and as a society, can confront, learn from, and hopefully even one day triumph over, these great stains on our civilization. The police are not immune from public scrutiny.

10. Of course those startling images that we saw—and continue to see—on the news or on our mobile devices were just the tip of the iceberg. The fact of the matter is that similar encounters occur daily across the country.

11. Sadly, the City of Baltimore epitomizes the lack of trust between Black communities and police departments. Although the memorable and highly publicized death of Freddie Gray while in police custody in 2015 is the highest-profile incident to place the BPD on the ignominious list of police departments whose conduct sparked calls for greater police accountability, training, and reform, it is by no means the only incident. Many other incidents

occur routinely in the City—some resulting in fatalities, and many others in physical and emotional injury and trauma.

12.     The magnitude of the BPD's abuse and brutality was exposed in a recent investigation and report on the subject by the United States Department of Justice ("DOJ").  The DOJ investigation revealed a broken institution with "deficient supervision and oversight of officer activity leading directly to a broad spectrum of constitutional and statutory violations," including the routine deployment of excessive force against individuals with mental health disabilities, juveniles, and residents who otherwise posed no threat.[1]  The 163-page Report provides example after example of the Police Department abuse, particularly against African-Americans.[2]  It is unsurprising therefore that the DOJ concluded that the BPD "engages in a pattern or practice of excessive force."[3]

13.     The BPD's unwillingness or inability to hold its officers accountable for police misconduct has exacerbated the Baltimore community's crisis of confidence in the Department. DOJ investigators found that Baltimore personnel "discourage complaints from being filed, misclassify complaints to minimize their apparent severity, and conduct little or no investigation."[4]  In fact, "[o]f the 2,818 force incidents that [the BPD] recorded in the nearly six-year period [DOJ] viewed, [the BPD] investigated only ten incidents based on concerns identified through its internal review.  Of these ten cases, [the BPD] found only one use of force to be excessive."[5]  In the rare instances when incidents of excessive force were investigated, Baltimore police officers stonewall and obfuscate to protect their own.  According to DOJ, "the

---

[1] U.S. Dep't of Justice, Civil Rights Division, Investigation of the Baltimore City Police Dep't 21 (2016), https://www.justice.gov/opa/file/883366/download.
[2] *See generally id.*
[3] *Id.* at 8.
[4] *Id.* at 10.
[5] *Id.* at 9.

chain of command fails to thoroughly and objectively evaluate officers' uses of force," evidence of police misconduct is not collected, and the accounts of officers accused of misconduct are instinctively credited over victim's accounts.[6]  A supervising officer told DOJ that it is not his responsibility during an investigation to "second-guess" his officer's use of force.[7]

14.     Nor does anyone in the Baltimore community, including the City's civilian leadership, have access to records of police activity.  DOJ concluded that the Police Department chooses not to "collect data on a range of law enforcement actions, and when it does collect data, [it] fails to store it in systems that are capable of effective tracking and analysis."[8]  Despite oft-voiced concerns about the Department's aggressive tactics, it did not require officers to report certain uses of force, such as punching, until 2016 and *it does not even keep complete records of instances of officer activity involving deadly force*.[9]  Without this basic information, neither the Police Department nor the City's civilian officials can identify officers that need training or discipline.  As a result, Baltimore residents are left hoping that officers who repeatedly engage in misconduct—including the 25 officers who have been sued four or more times during the last five years for excessive force or civil rights violations—do not show up at their doorstep.

15.     The BPD has thrown sand in the gears at every step of the process intended to ensure supervision and accountability.  The DOJ Report is a damning indictment of the current system, and it is clear that the BPD has proven incapable of policing itself.

16.     The DOJ's investigation resulted in a consent decree finding that the BPD "engages in a pattern and practice of conduct that violates the First, Fourth and 14th Amendments

---

[6] U.S. Dep't of Justice, Civil Rights Division, Investigation of the Baltimore City Police Dep't 9, 45, 62, 104 (2016), https://www.justice.gov/opa/file/883366/download.
[7] *Id.* at 106.
[8] *Id.* at 134.
[9] *See id.* at 98–100.

of the Constitution as well as federal anti-discrimination laws."[10]  The consent decree, filed in this Court on January 12, 2017, requires the BPD to make necessary reforms focused on "building community trust, creating a culture of community and problem-oriented policing, prohibiting unlawful stops and arrests, preventing discriminatory policing and excessive force, ensuring public and officer safety, enhancing officer accountability and making needed technological upgrades."[11]

17.    Historically, rather than opening itself up to public scrutiny and departmental reform, the BPD has adopted an unsettling policy of trying wherever possible to keep the lid on citizen allegations of police brutality.  The BPD has even gone so far as to destroy a private citizen's cell phone footage of police brutality.[12]  After he recorded Baltimore Police officers roughing up a female friend of his at the 2010 Preakness Stakes, Chris Sharp was detained and harangued by the police officers.[13]  When the police officers demanded that he surrender his cell phone as "evidence," Mr. Sharp politely declined, but the police insisted that he hand over his phone.[14]  Fearing arrest, Mr. Sharp gave his cell phone to the Baltimore police officers, who proceeded to delete the beating videos and all other videos his cellphone contained.[15]  Mr. Sharp and the ACLU of Maryland filed a lawsuit against the BPD alleging First Amendment violations.[16]  Shockingly, the BPD took the position that all of its policies were confidential, and for a time even refused to allow the court to review them.  Indeed, BPD's discovery practices in

---

[10] Press Release, U.S. Dep't of Justice, Justice Department Reaches Agreement with City of Baltimore to Reform Police Department's Unconstitutional Practices (Jan. 12, 2017), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-city-baltimore-reform-police-department-s.
[11] *Id.*
[12] Justin Fenton, *ACLU To Sue Police Over Wrongful Detention Deletion of Arrest Video*, Baltimore Sun, Aug. 4, 2011, http://www.baltimoresun.com/news/maryland/baltimore-city/.
[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*

the *Sharp* case became so egregious that the department and its Chief Counsel were strongly sanctioned and fined $1,000 by this Court.[17]   The parties ultimately settled, but the case prompted an unprecedented legal statement from DOJ in 2012 affirming that citizens have a constitutional right to record police officers publicly performing their official duties.[18]

18.    Since 2009, the City has paid more than $33.4 million to settle civil lawsuits filed against the BPD alleging police brutality.[19]

19.    On information and belief, according to the longtime City Solicitor George Nilson,[20] in about 95 percent of those settlements, the City has included what amounts to a gag order to prevent additional details about the Police Department's conduct from being disclosed.[21]

20.    The Police Department's policy has not gone unnoticed or without criticism.   Its critics, who include both media outlets and civil rights advocates interested in police accountability and greater governmental transparency, have advocated for change to its gag order policy in particular.   Indeed, the BPD did take up reconsideration of its gag order policy amid widespread media coverage exposing the provision as corrosive and contrary to the public

---

[17] *Sharp v. Baltimore City Police Department et al.*, Civil No. CCB–11–2888, 2013 WL 937903, * 2–3 (D. Md. Mar. 1, 2013) (condemning "a veritable witch hunt" intended to scare Mr. Sharp into dropping his lawsuit and holding that "[d]efendants' discovery abuse is particularly egregious given the enormous power that police defendants wield over citizens, [and] their enhanced ability to track information about citizens . . .").
[18] U.S. Dep't of Justice, Statement of Interest, *Sharp v. Baltimore City Police Department et al.*, No. 11–2888-BEL, 2012 WL 9512053, (D. Md. Jan. 10, 2012).
[19] This includes the $6.4 million settlement for Freddie Gray. *See* Baltimore to pay Freddie Cray's family $6.4 million to settle civil claims, The Baltimore Sun, 06/23/2017, http://www.baltimoresun.com/news/maryland/freddie-gray/bs-md-ci-boe-20150908-story.html.
[20] In late August 2016, Mr. Nilson was abruptly terminated from his position, but he held the job of the City's chief counsel during most times pertinent to this case.
[21] Scott Calvert & Zusha Elinson, *Violating Baltimore's Deal Restrictions Can Be Costly*, Wall St. J., Oct. 19, 2015, https://www.wsj.com/articles/violating-baltimores-deal-restrictions-can-be-costly-1445299401.

interest.  Instead of reforming the policy, however, the BPD, on information and belief, doubled down on it by broadening the gag orders' coverage.[22]

21.    This lawsuit stems from the City's application of the gag order, which reflects a formal policy of the City of seeking to bury the truth about potentially unlawful conduct by the BPD and to penalize individuals who engage in free and lawful speech about that conduct.  The policy is offensive to basic notions of protected speech and sound public policy in a free and democratic society.

22.    The one-sided provision—incorporated into the standard agreement the City uses to settle civil rights and related lawsuits filed against its Police Department or it—bars settling plaintiffs from discussing the facts of their lawsuits, on pain of losing half of all settlement proceeds.  The City, on the other hand, is bound by no such restriction, and routinely provides its distorted version of the facts of each case, with no risk or penalty.  The following is a typical articulation of the policy, as it appeared in the City's settlement agreement with Ms. Overbey:

> It is understood and agreed by the Settling Parties that in exchange for the payment of the Settlement Sum by the Released Parties, the Releasing Party, and that party's agents, representatives and attorneys shall strictly refrain from and avoid any attempt at defaming and/or disparaging the Released Parties, including each of the Released Parties' employees or agents regarding any matter related to, or arising from, the Litigation or the Occurrence. Further, in exchange for the payment of the Settlement Sum by the Released Parties and because the allegations of the Occurrence and Litigation are disputed, the Settling Parties agree that the Releasing Party and his or her agents, representatives and attorneys, shall limit their public comments regarding the Litigation and the Occurrence to the fact that a satisfactory settlement occurred involving the Parties.  It is understood and agreed by the Settling Parties that this limitation on public statements shall include a prohibition against discussing any opinions, facts or allegations in

---

[22] The BPD also covered up incidents of police brutality by classifying citizen complaints against officers as personnel files.  Because state law prohibits the disclosure of personnel matters, the public view into these complaints was obstructed.

any way connected to the Litigation or the Occurrence, or substance of any prior settlement offers or discussions with the news media, except that the Releasing Party's counsel may indicate that the Litigation has been settled to avoid the cost, time, expense and uncertainties of protracted litigation.

The Settling Parties agree and understand that a breach of the obligations set forth in this Paragraph 9 is deemed by the Settling Parties to be a material breach of this Agreement for which the City is entitled to a refund of fifty percent (50%) of the Settlement Sum ($31,500.00) from the Releasing Party.  The remainder of the Settlement Sum and all other obligations of this Agreement shall remain in force.  If it is necessary for the City to pursue recovery in litigation of the refund it is entitled to under this paragraph, the City will be entitled to recover all reasonable attorneys fees, costs and expenses of such litigation from the Releasing Party.

23.     On its face, this gag order stymies the ability of the press, including Baltimore Brew, to exercise its First Amendment right to obtain newsworthy information from victims of Police Department abuse by muzzling those victims on pain of losing half of their settlement proceeds.  The City is well aware that many victims of police brutality are the City's very poorest residents, who live under extreme economic stress and duress on a day-to-day basis and would be hard-pressed to refuse to "shut up about it" where it would mean losing out on tens or even hundreds of thousands of dollars.  From the media's perspective, this is highly damaging as the settling individuals will almost always have insightful and potentially newsworthy information to share about the conduct of the Police Department beyond the four corners of their civil rights complaints which, although usually publicly available, are frequently scant on detail and particularly ill-suited to video coverage.  The gag order hinders the press's ability to discover, investigate, and report on that information fully and accurately.

24.     As discussed below, Plaintiff Baltimore Brew is a media victim of this policy.  It has been thwarted in its efforts to report fully and accurately on various allegations of police misconduct in the City of Baltimore because alleged victims who have settled civil actions

against the Police Department have refused to speak to Baltimore Brew expressly *on account of* the gag order in their settlement agreements.

25.     The press—through its investigative component—can only do its job of ferreting out the newsworthiness of a given incident if it has access to news sources.  When there is no video or other recording, it makes having direct access to the participants all the more important.

26.     In application, the policy offends in a second way where a settling plaintiff who *does* choose to speak up—no matter whether the speech in any way harms or disparages the BPD—is denied half of the agreed-upon settlement proceeds for commenting on the settled civil litigation, in effect penalizing the protected speech of the settling plaintiff.  That is exactly what happened to Ms. Overbey.

27.     The City of Baltimore's pattern and practice of coercing silence from alleged victims of police brutality or penalizing them if they choose not to remain silent offends basic principles of free speech as protected by the First Amendment to the United States Constitution and the public policy of the State of Maryland.

### *Baltimore's Recent History of Settling Police Brutality Civil Actions*

28.     Baltimore City is no stranger to civil rights lawsuits alleging unlawful brutality of the Police Department.  As mentioned above, between 2009 and 2017, the City has paid more than $33.4 million in settlements and court judgments for lawsuits alleging brutality and other police misconduct by law-abiding Baltimore citizens, including elderly grandparents, innocent parents of minor children, and pregnant women.

29.     The largest settlement was the result of an April 2015 arrest of 25-year-old Freddie Gray. Mr. Gray was stopped by BPD officers because he allegedly ran away from the police after noticing their presence. Once Mr. Gray stopped running, the police arrested him for

possession of a knife, later determined to be one Gray was carrying lawfully.  The arrest was recorded by a bystander, but what unfolded afterward, inside of the van transporting Mr. Gray to the police station, remains unclear even to this day. Details of what happened inside the van include the fact that Mr. Gray was handcuffed and not restrained by a seat belt.  Although he informed the officers that he was having difficulty breathing and requested an inhaler, the officers made multiple stops before getting Mr. Gray the medical attention he required. Although the exact cause of Mr. Gray's injury is unclear, it is undisputed that Mr. Gray's spine, which was fully intact prior to entering the van, was almost completely severed by the time officers removed him from the van.  After lying in a hospital bed comatose for a week, Mr. Gray died on April 19th, 2015.  In September 2016, the city of Baltimore paid Mr. Gray's estate $6.4 million to avoid a civil lawsuit by Gray's family.

30.      In addition to the Freddie Gray settlement, the cases settled by the City include the following accounts:

- In 2007, Ms. Venus Green, an 87-year-old African-American woman was assaulted and battered by officers who responded to her 9-1-1 call after her grandson was shot.  As alleged in her complaint, Green had telephoned for an ambulance after she heard her grandson yell from down the street that he had been shot.  When police arrived, they accused Green and her grandson of lying about the circumstances and location of the shooting, alleging that the shooting and taken place inside Green's house.  An officer demanded to enter Green's house to prove that the shooting had taken place inside, and more specifically in the basement, where her grandson lived.  After the officer unlatched the basement door—without Green's permission or a warrant—Green informed the officer that

she would need to close the door behind him because her grandson's two dogs were in the basement.  In response to her statement, the officer grabbed Green, threw her on the floor, and said "I'm going to lock you up.  You don't want us to go downstairs.  Bitch, you are no better than any of the other old black bitches that I have locked up."   The officer then dragged Green along her living-room floor, pressed his knee into her back, twisted her arms, handcuffed her, and threw her face down onto her couch.   Green sustained a broken shoulder from the assault.  She filed suit against the City in November 2010 and settled in April 2012 for $95,000.

- In 2008, Wesley Williams and Shaney Pendelton were punched, kicked, and choked by plainclothes officers in front of their minor children.  On May 13, 2008, Williams and Pendelton planned to exchange possession of their children, Donte (then age 6) and Wesley (then age 2), at 9:00 p.m. outside of Williams' house.  As Williams exited his home, he was approached by plainclothes officers brandishing handguns.  Although Williams stopped and put his hands in the air, assuming that he was being robbed, the officers began to punch and kick him without provocation or resistance.  Pendelton arrived with her two children and witnessed the shocking assault by assailants she supposed were armed robbers. Pendelton exited her vehicle and attempted to call 9-1-1 to report the incident. However, the officers informed Pendelton that she was not allowed to contact the Police Department.  When Pendelton tried to walk to the rear of her vehicle in order to complete the call, an officer brutally tackled her, face first, to the ground. As a result of the officers' actions, both Williams and Pendelton suffered extreme

physical injuries, emotional pain, and distress.  Williams and Pendelton brought suit against the officers in 2011.  The City reached a $155,000 settlement with Williams and Pendelton in 2012.

- In September 2009, Starr Brown, a pregnant 26-year-old African-American woman, was entering her house with her 3-year-old daughter when she saw a group of girls attack two other girls walking down her block.  The attackers fled before the police arrived.  When the police showed up, they began chastising the victims.  Brown attempted to explain to officers what she had witnessed, urging the officers to pursue the attackers rather than harass the victims.  However, the officers responded by arresting her.  Although Brown informed the officers that she was pregnant, one officer lunged at her, "tossed [her] like a rag doll," and forcefully shoved his knee into her back and neck.  Another officer joined the assault, also forcing her knee into Brown's back while handcuffing her.  The officers arrested Brown for obstruction, disorderly conduct, resisting arrest and assault. After a judge acquitted Brown of all criminal charges, she sued the City in April 2010.  The City settled Brown's case in March 2011 for $125,000, subject to the gag order.

- In December 2009, police officers violently abused 77-year-old African-American James "Lenny" Clay during a traffic stop.  Officers began to pursue Clay after he hit a parked car, suspecting that Clay may have been intoxicated. Clay did not immediately hear the officers directing him to pull over, but eventually stopped his vehicle.  During his traffic stop, the arresting officers slammed Clay to the ground, fracturing his arm, breaking his eyeglasses, and

cracking his dentures.   Clay filed a $26 million lawsuit against the officers, alleging battery, excessive force, and gross negligence.  The City agreed to settle the case for $63,000 in 2013.

- In September 2012, Anthony Anderson was walking to his East Baltimore home when three plain-clothed men approached him in a vacant lot.   After a short confrontation, the men—later identified as police officers—grabbed him, pinned his arms to his side, and slammed him on his neck.  They proceeded to smash his collar bone and throw him to the ground.  Once he fell, they began kicking him in his ribs, stomach, back, and chest for several minutes.   Anderson's mother, daughter, son, and two-year-old granddaughter, and many onlookers, watched and witnessed the brutal attack from a short distance away.  Anderson died moments later from internal bleeding.  Although the officers tried to attribute his death to the alleged drugs they arrested him for, the medical examiner's report ruled his death a homicide.  According to the report, Mr. Anderson suffered eight fractured ribs and a ruptured spleen.  In 2013 Mr. Anderson's family filed a wrongful death suit. In 2017 the City approved a $300,000 settlement, which included the gag order.

- In October 2013, a BDP officer tased 28 year-old Tavon Sherman after two other officers stopped Mr. Sherman because they had an open warrant for the vehicle in which Mr. Sherman was a passenger. The officers allege that Mr. Sherman initially refused to obey their orders to sit on the curb after he exited the vehicle. One officer warned Mr. Sherman that he would be tased should he not sit on the curb.  Although Mr. Sherman ultimately complied, the officer claimed that he

found it necessary to tase Mr. Sherman due to his "continued flailing," and use of profanity.   In response to the incident, Mr. Sherman brought suit against all three of the officers involved.  In 2015 the City settled the case for $35,000, subject to the gag order.

- In December 2013, a BPD officer punched 19-year-old high schooler Keondre Boykin in his mouth.  Mr. Boykin had been walking along Litchfield Avenue that evening when two officers ordered Boykin to stop because an unlit streetlight was preventing them from seeing his face.  Although Mr. Boykin initially refused to stop and sit down, he eventually did so.  Shortly thereafter, a fight erupted between Boykin and the officer who eventually punched him on grounds that Mr. Boykin was "pulling away" and "flailing his arms."  Upon being punched in the mouth, Mr. Boykin was taken to Sinai Hospital to receive treatment.  In 2015 Baltimore City paid Mr. Boykin a settlement of $75,000, subject to the gag order.

- On October 21, 2014, a BPD officer working in an unmarked car confronted Albert Smith while Smith was walking.   Mr. Smith was questioned about a transaction in which he allegedly participated.  The officer got out of his car and demanded Mr. Smith spit out what he had in his mouth (which was gum).  When Smith refused, the officer began to choke him until the gum Mr. Smith had in his mouth fell onto the ground.   Even after realizing the substance was gum, the officer took Mr. Smith to the Southern District police station for booking.  Mr. Smith was later diagnosed with a traumatic fracture to his neck bone and a sprain to a neck muscle.  He also had back pain and bruising to his neck.  Mr. Smith

sued the City for assault, battery, false arrest, and false imprisonment.  The City approved a $60,000 settlement in 2017, which included the gag order.

31.     In all of these cases, in light of their economic circumstances, the settling plaintiffs had little practical choice but to agree to remain quiet about additional details underlying their claims of police brutality.

### *Ms. Overbey's Encounter with the BPD*

32.     The harm suffered by Ms. Overbey as a result of the City's policy arises out of an incident that occurred on April 30, 2012, at her apartment in the Cedonia area of Baltimore.

33.     That evening, at approximately 9:40 p.m., Ms. Overbey contacted the BPD to report that her apartment had been burglarized.  Ms. Overbey was a victim; she called the police for *help*.  What she received instead was even greater mistreatment and abuse from the very police who were responding to her call for assistance.

34.     Three sets of police officers were dispatched to her apartment at various points in the evening in response to her report. The first officer who arrived on the scene remarked that Ms. Overbey should be accustomed to burglary, given the location of her residence.  Officer Sheena Newman arrived second, briefly interviewed Ms. Overbey, and contacted the crime lab unit.  The crime lab unit arrived while Newman was still in Ms. Overbey's apartment.  Newman, however, left the premises before the unit finished processing the scene.

35.     While the crime lab unit was still at Ms. Overbey's apartment, Officer Fred Hannah forcefully entered and began searching her apartment without her permission.  Unbeknownst to Ms. Overbey, the crime lab unit had radioed for police officers to return to the apartment, and Officer Hannah had responded to that call.

36.     Ms. Overbey asked Officer Hannah to explain his presence in her apartment, but he neither identified himself nor explained the purpose of his being there.

37.     Instead, Officer Hannah became aggressive and violent.  Without any provocation by her, he grabbed Ms. Overbey by her hair, twisted her arm behind her back, and violently slapped and punched her.   He then, without cause or justification, shouted at Ms. Overbey, telling her that she was under arrest.  When Ms. Overbey asked why she was being arrested, Officer Hannah yelled, "[b]ecause you talk too much, bitch," or words to that effect.

38.     Officer Martin Richardson arrived shortly after the assault and began violently and maliciously beating Ms. Overbey with clenched fists, causing Ms. Overbey further bodily injury, including a black eye so severe that it persisted for a month and a half.

39.     Ms. Overbey's mother, Jenean Derrise Kelly, begged Officers Hannah and Richardson to stop.  Officer Hannah responded by arresting Ms. Kelly and dragging her outside to a squad car.  As he did so, he called Ms. Kelly a "stupid bitch," or words to that effect.

40.     While Officer Richardson continued to restrain and beat Ms. Overbey, a third officer, Grant Galing, arrived on the scene and yelled "Taser!"  As Officer Richardson slightly loosened his grasp on Ms. Overbey, presumably to avoid being struck by the Taser, Officer Galing unjustifiably used his Taser on Ms. Overbey, inflicting further injury on her.

41.     As Officer Galing prepared to use his Taser on Ms. Overbey a second time, Ms. Overbey was able to scurry away from Richardson's grasp to avoid being tased a second time.

42.     This appears to have infuriated Officer Galing, who responded by tackling Ms. Overbey.  Using his full body weight, he restrained her and cut off her airway by placing his knee on her throat, choking her and making it hard for her to breathe.

43.    When Ms. Overbey tried to tell Officer Galing that she could not breathe, he replied, "Shut the fuck up, bitch," or words to that effect, as he continued to choke her by holding her down with his knee on her throat.  Officer Galing then stunned Ms. Overbey again with his Taser.

44.    After being beaten, tased, tackled, choked, and handcuffed, Ms. Overbey was transported by ambulance to Johns Hopkins Bayview Hospital and then to the Baltimore Central Booking and Intake Center, where she was incarcerated.  Ms. Overbey was jailed for 24 hours and charged with six counts of assault and one count of resisting arrest.

45.    Officer Hannah instituted criminal proceedings against both Ms. Overbey and her mother; however, the Office of the State's Attorney for Baltimore City declined to prosecute and dropped all charges against both Ms. Overbey and Ms. Kelly.

46.    Subsequently, Ms. Overbey and Ms. Kelly filed a Complaint in the Circuit Court for Baltimore City against the City and Officers Hannah, Richardson, and Galing for wrongful arrest and unwarranted physical abuse on the night of April 30, 2012.  In her Complaint, Ms. Overbey stated claims for false arrest and false imprisonment, battery, violation of the Maryland Declaration of Rights, and malicious prosecution.

47.    Ms. Overbey's mistreatment by the BPD and her ensuing litigation against the City were emotionally and financially draining on her.  Ms. Overbey was only 25 years old when she was savagely beaten by the police; she was a single mother of two young children; and she was the primary source of income for her household.  Although the City dropped the bogus criminal charges against her, the arrest adversely impacted her ability to find work and provide for her family.  Employers refused to hire her because of her "criminal" record.  Without a job, she was unable to afford rent.

48.     Ms. Overbey pursued her civil suit against the City for approximately two years before she was presented with a settlement agreement (the "Settlement Agreement").   The Agreement is attached hereto as "Exhibit A."

49.     Pursuant to the terms of the Agreement, the City agreed to pay Ms. Overbey $63,000.00 to dispose of her civil action.   The City also agreed to pay Ms. Kelly $13,000 to settle her allegations against the City and the Officers.

50.     The Agreement stated that funds would be disbursed as follows:

> In consideration of the Settling Parties' agreement to enter into this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is acknowledged by the Settling Parties, within sixty (60) days of the approval of this Agreement by the Baltimore City Board of Estimates, the City shall make the sum total payment to the Releasing Party of Sixty-Three Thousand Dollars ($63,000.00) on behalf of the Released Parties, as full and final payment for making the Release set forth in this Agreement ("Settlement Sum").

51.     Section 9 of the Settlement Agreement stated the City's gag policy:

> It is understood and agreed by the Settling Parties that in exchange for the payment of the Settlement Sum by the Released Parties, the Releasing Party and that party's agents, representatives and attorneys shall strictly refrain from and avoid any attempt at defaming and/or disparaging the Released Parties, including each of the Released Parties' employees or agents regarding any matter related to, or arising from the Litigation or the Occurrence. Further, in exchange for the payment of the Settlement Sum by the Released Parties and because the allegations of the Occurrence and Litigation are disputed, the Settling Parties agree that the Releasing Party and his or her agents, representatives and attorneys, shall limit their public comments regarding the Litigation and the Occurrence to the fact that a satisfactory settlement occurred involving the Parties.  It is understood and agreed by the Settling Parties that this limitation on public statements shall include a prohibition against discussing any opinions, facts or allegations in any way connected to the Litigation or the Occurrence, or substance of any prior settlement offers or discussions with the news media, except that the Releasing Party's counsel may indicate that the Litigation has been settled to avoid the cost, time, expense and uncertainties of protracted litigation.

The Settling Parties agree and understand that a breach of the obligations set forth in this Paragraph 9 is deemed by the Settling Parties to be a material breach of this Agreement for which the City is entitled to a refund of fifty percent (50%) of the Settlement Sum ($31,500.00) from the Releasing Party. The remainder of the Settlement Sum and all other obligations of this Agreement shall remain in force. If it is necessary for the City to pursue recovery in litigation of the refund it is entitled to under this paragraph, the City will be entitled to recover all reasonable attorneys fees, costs and expenses of such litigation from the Releasing Party.

52.     Ms. Overbey's attorney encouraged Ms. Overbey to sign the Agreement.

53.     Ms. Overbey was apprehensive about signing the Agreement because she knew that the officers who maliciously beat her would be absolved of their illegal actions, probably receive no discipline, and remain at liberty on the police force to treat other residents of Baltimore City as they had treated her. Given her dire financial situation, however, Ms. Overbey felt she had little choice but to accept the gag order in order to collect the full cash settlement offer. Accordingly, she signed the Agreement with the City and the Officers in August 2014.

54.     Ms. Overbey did not understand the gag order in the same manner as it was subsequently applied by the City in denying her half of the settlement proceeds. For one thing, her attorney told her that the Agreement prohibited ***both*** her ***and*** the City from talking to reporters about the allegations or facts of her case. For another, again relying on her attorney's explanation of the Agreement and of the gag order in particular, Ms. Overbey understood that the gag order prohibited the parties from speaking with ***the media***, i.e., reporters who worked directly for television, radio, newspaper and internet outlets; Ms. Overbey did not appreciate at the time that, at least according to how the City later interpreted it, the Agreement prohibited her from discussing her case in any public forum, and that the prohibition against speaking publicly only applied to her, and not the City.

55. The only apparent purpose of the gag order was to keep Ms. Overbey from speaking any further about her abuse at the hands of the Police Department so that the City might keep the public ignorant of the misconduct of its police officers.

56. Plaintiff's attorney informed her that she would receive her payment a few weeks after the date of signing the Agreement.

57. On September 10, 2014, City Solicitor Nilson sought approval of the Agreement from the Board of Estimates, which must review any settlement greater than $25,000. In explaining the settlement, Mr. Nilson misrepresented to the Board of Estimates that, on the night she was assaulted, Ms. Overbey had been "hostile" and that she got into a "verbal confrontation" with the police.

58. Before Ms. Overbey received her funds, and to her great surprise, *The Baltimore Sun*, using Ms. Overbey's mug-shot photo published an article on September 15, 2014 about the City's decision to pay Ms. Overbey to settle her case (noting the amount of $63,000). The newspaper had learned of the settlement because the records the administration sends to the Board of Estimates requesting approval of the settlement amount are public.

59. Ms. Overbey was caught off guard seeing her name, mug-shot photo, and the settlement amount printed on the front page of *The Baltimore Sun*, especially since it had been her understanding that the details of the settlement were confidential. As a woman of modest means living in one of the City's most poverty-stricken neighborhoods, Ms. Overbey was especially fearful that she and her family members would be targeted for further burglary since the *Sun* article identified her by name and photograph and could easily have given readers the impression that she was now sitting on a pile of cash in her apartment.

60.     Ms. Overbey was also angered by Mr. Nilson's statements to the media, which appeared to blame her for her mistreatment by the police.

61.     Ms. Overbey's anger was further stoked by comments made by readers of the *Sun* article on the newspaper's public blog site, accusing Ms. Overbey of initiating her arrest to recover a large payout from the City.  The ugly, racially tinged comments depicted her as a poor, avaricious Black woman using her race and lies to leverage a big payday from the City's taxpayers.

62.     Understandably upset, Ms. Overbey replied to the anonymous postings, stating that people should learn facts before making disparaging comments.  Additionally, to refute the accusation that she had assaulted the officers from the BPD, Ms. Overbey responded by reciting the facts of her assault as alleged in her publicly available complaint.

63.     The entirety of the exchange between the commenters and Ms. Overbey on the *Sun*'s blog site read as follows:

> Co.Owner:  "I'm sorry for your experience, but pushing a Police Officer does not work.  No matter what your race is, you never touch a police officer; you do answer all questions; and assist when possible.  I would rather be shot by a Taser, then a bullet.  I can"t wait until you need their help in the future.  Enjoy the money!!"
>
> Ms. Overbey replied:  "I am the woman who this article is talking about AND THE POLICE WERE WRONG!!  This article doesn't come close to WHAT REALLY HAPPENED or tell how three men over 200 lbs each beat me (115 lbs) bruises all over my body a black eye AND tased twice all in front my 2 yr old daughter so before you decide to put ur MEANINGLESS opinion in on something FIND OUT THE FACTS FIRST!  IF I were wrong my charges wldntve ben thrown out and i wldntve received a dime.  Its people like you who make this cite the ****it…"
>
> MissDaisy:  "So, OK, I can call the cops, assault one of them, get tased and get paid!  Sounds like a plan!"
>
> Ms. Overbey replied:  "I am the woman who this article is talking about AND THE POLICE WERE WRONG!!  This article doesnt

come close to WHAT REALLY HAPPENED or tell how three men over 200 lbs each beat me (115 lbs) bruises all over my body a black eye AND tased twice all i nfront my 2 yr old daughter so before you decide to put ur MEANINGLESS opinion in on something FIND OUT THE FACTS FIRST!  IF I were wrong my charges wldntve ben thrown out and i wldntve received a dime. Its people like you who make this cite the ****it…"

Ms. Overbey continued:  "AND THIS WAS ALL AFTER I CALLED THEM FOR HELP AFTER MY HOME HAD BEEN BURGULARIZED WHILE I WAS AT WORK!!  SO ANYONE WHO HAS ANYTHING TO SAY (NEGATIVITY) YOU CAN TAKE UR OPINION AND SHOVE IT!!"

Ms. Overbey added:  "I pay my taxes and support myself like everyone else but unlike a lot of other people I KNOW MY RIGHTS and I refused to let them get away with this AGAIN!!"

64.     On October 8, 2014, Ms. Overbey's attorney received a letter from the City with a check payable to Ms. Overbey and her attorney in the amount of $31,500.  The letter indicated that Ms. Overbey was receiving only half of the agreed-upon settlement payment on account of her having responded on the *Sun*'s blog site regarding the case.

65.     The City withheld half of the cash settlement unilaterally.  The City provided Ms. Overbey with neither notice nor a hearing prior to withholding half of the settlement amount.  In fact, no process was afforded Ms. Overbey at all.

66.     Needless to say, Ms. Overbey was confused and distraught.  As far as she understood, she had done nothing wrong or inconsistent with the Agreement; nor did she think it was consistent with the Agreement for the City to simply decide for itself, without any process whatsoever, that she had violated the gag order and thus forfeited her right to half of the cash settlement—an agreed-upon amount in exchange for which for which she had given the City valuable consideration by dropping her lawsuit.

67.     In short, as interpreted and applied by the City, the gag order was decidedly one-sided:  it prevented Ms. Overbey from saying anything about the case yet provided the City with

free rein to disparage her.  This was not consistent with Ms. Overbey's understanding of the gag order at the time she signed the Agreement.

### ***Background Allegations Specific to Baltimore Brew***

68.     Baltimore Brew began reporting on BPD lawsuits and settlements involving allegations of police brutality in the summer of 2011.

69.     Baltimore Brew would frequently attend Board of Estimates meetings to obtain information on the City's expenditures of public money.

70.     The Board of Estimates published its agenda a few days before each meeting.  For settled lawsuits above $25,000 the agenda included the names of the plaintiffs and defendants and the settlement amount.

71.     Settlements resulting from lawsuits alleging brutality and excessive force by the BPD were regularly included in the agenda.  In every case covered by Baltimore Brew, the Board has approved each settlement without discussion or comment as a part of its routine agenda.

72.     After the Board of Estimates approved the expenditures, the City released a memorandum for each settled lawsuit, which briefly described the dispute and the amount approved by the Board.  For disputes that involved allegations of police misconduct, the description was primarily based on the police officer's narrative, as it was drafted by BPD's legal department.

73.     Then-City Solicitor George Nilson would willingly discuss the terms of the settlement and the incident that gave rise to the lawsuit, but explicitly informed Baltimore Brew that all police settlements prohibited the plaintiff and his or her attorney from discussing any

aspect of their case and settlement with the news media—on pain of the city "clawing back" a portion of the settlement.

74.     Frustrated by the incomplete account presented in the City's summaries, Baltimore Brew attempted to speak directly with the officers involved in the lawsuits, but the *Brew* was informed that the City prohibits its police officers from speaking to the press; instead all media inquiries must be directed to the BPD's public relations office.  To make matters worse, Baltimore Brew later discovered that state law precluded the public relations office from revealing information about the settlement because the litigation was considered personnel and internal police matters.

75.     On several occasions, Baltimore Brew attempted to contact plaintiffs directly to obtain more details about the lawsuit.  Despite promises of confidentiality and anonymity, plaintiffs rarely agreed to comment on the incident or settlement, because of the gag order and the severe penalty that accompanied a breach of the gag order's restrictions.

76.     Thus, in most cases, Baltimore Brew was forced to rely on the City's one-sided memorandum and subjective statements from Mr. Nilson when reporting on lawsuits involving police brutality without getting a firsthand account from interviews with the victim.[23]  The City's policies have severely limited Baltimore Brew's ability to fully and accurately report on the issue of police brutality and abuse of power in Baltimore.

---

[23] Baltimore Brew occasionally relies on excerpts from complaints and pleadings in Baltimore Circuit Court, which are publicly available.

## COUNT I

**First Amendment – The City Unlawfully Penalized Protected Speech**
(by Ms. Overbey)

77.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

78.     Ms. Overbey engaged in protected activity under the First Amendment by responding to the comments of online readers of a *Baltimore Sun* article about her settlement with the Defendants, describing the brutality that she suffered at the hands of the BPD, and providing several key facts omitted from the article.

79.     Ms. Overbey's speech and expression were related to matters of public concern.

80.     Ms. Overbey's online comments concerned the behavior of public officials in their government capacity.

81.     Defendants penalized Ms. Overbey for engaging in protected speech by denying her half of the cash settlement on account of the unlawful gag order.

82.     Because the gag order violates both the spirit and letter of the First Amendment and public policy, it is unlawful and void *ab initio*.

83.     Defendants' retaliatory actions were motivated by Ms. Overbey's exercise of her First Amendment right of free speech.

84.     By penalizing Ms. Overbey by unlawfully denying her half of her settlement offer, Defendants have chilled the future speech and expression of other similarly situated plaintiffs who reach settlement agreements with the City of Baltimore.

85.     Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, and in reckless disregard of Ms. Overbey's constitutional rights.

86.     At all times relevant to this Complaint, Defendants were acting under the color of law.

87.     Defendants' actions caused, directly and proximately, Ms. Overbey to suffer damages.

## COUNT II

### First Amendment – the Gag Order Unconstitutionally
### Impinges on Freedom of the Press
(by Baltimore Brew)

88.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

89.     The City's institutional inclusion of the gag order in its settlement agreements with civil plaintiffs seeking relief for alleged police brutality—used in approximately 95 percent of all such agreements—is tantamount to a pattern and practice of interference with the right of the press to fully and completely investigate and report on facts of public concern as guaranteed by the First Amendment.

90.     The personal stories of the victims of police brutality that give rise to civil lawsuits against the Police Department are frequently a matter of public concern.

91.     On multiple occasions, plaintiffs who have settled civil rights lawsuits against BPD have refused to talk to Baltimore Brew specifically because of the gag order in their respective settlement agreements.

92.     The gag order that the City uses in 95 percent of all agreements settling such lawsuits restrains free and lawful speech about issues of public concern and in the process impedes the free exercise of the press as protected by the First Amendment.

93.     Through its pattern and practice of interference with the press's access to facts and information about police misconduct by silencing settling plaintiffs through the inclusion of

28

the gag order in 95 percent of all settlement agreements, the City impedes the ability of the press

generally, and Baltimore Brew specifically, to fully carry out the important role the press plays

in informing the public about government actions.

94.     Defendants' actions caused, directly and proximately, Baltimore Brew to suffer

damages, through loss of its First Amendment freedoms.

### COUNT III

**Public Policy – The Agreement Violates Maryland Public Policy**
(by both Plaintiffs)

95.     Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth

herein.

96.     Contracts are invalid to the extent they are patently offensive to the public good.

97.     Maryland public policy promotes the disclosure of information related to the

administration of state and local services, particularly as respecting issues of public concern and

safety.  *See Bowen v. Davidson*, 135 Md. App. 152, 157 (Md. Ct. App. 2000) (The Maryland

Public Information Act "establishes a public policy that favors disclosure of government or

public documents.").   In addition to legislation, Maryland courts look to society's changing

mores and the "common sense of the entire community," in discerning whether contract

provisions undermine public policy.  *See Stancil v. Erie Ins. Co.*, 128 Md. App. 686, 691 (Md.

Ct. Sp. App. 1999) (quoting *Estate of Woods, Weeks & Co.*, 52 Md. 520, 536 (1879)).  It is the

public policy of every state, including Maryland, to encourage the disclosure of criminal activity,

and non-disclosure agreements are void if they require silence in the face of an unreported crime.

98.     The gag order in the Settlement Agreement interferes with Maryland's policy, as

articulated in the Maryland Public Information Act, of promoting the ***disclosure*** of information

pertaining to the efficacy of government bodies.   This public policy interest is manifold in

Baltimore, where allegations of police misconduct have aroused suspicion among local residents, and the systemic use of gag orders in settlement agreements with the City of Baltimore have further eroded the public trust.  The continued use of gag orders, such as the one the City used to try to prevent Ms. Overbey from discussing her physical abuse at the hands of the police, hinders the citizenry's ability to make informed choices about its public officials, undermines the public trust, and contravenes the well-established public policy that contracts should not be used to prevent the disclosure of criminal activity, regardless of whether the perpetrator is a police official or civilian.

99.     The gag order also impairs the media from performing its vital role as government watchdog.  Media outlets such as Baltimore Brew cannot report on essential public policy issues such as public safety and government accountability when they are walled off from the facts underlying incidents of police misconduct.

100.    The gag order is also unfair in its one-sided restriction on speech, applying to the victims but not the City (at least as far as the City appeared to interpret it in Ms. Overbey's case). Given the City's right to publicize settlements in a manner that puts the City in a better light vis-à-vis the victims, it is outrageous that the victims are prohibited from even commenting on the City's characterizations (or, even more so, mischaracterizations), let alone speaking out affirmatively.

101.    The gag order also offends public policy because of how the City goes about extracting the agreement from the victim:  by playing off the victim's poverty.  The gag order is not the result of fair bargaining between equally sophisticated parties.  Even when represented by counsel, as Ms. Overbey was, the City will usually hold the cards.  Much like the torture victim who signs a confession to stop the torture, victims like Ms. Overbey—who are responsible for

the care of other people, including children, who depend on them for food and shelter—are typically in no position to say "no."  The City knows and exploits that imbalance of bargaining power.

102.    The City not only used its unequal bargaining power to compel Ms. Overbey's agreement, but the City also was the source of that unequal bargaining power.  Prior to her unlawful arrest, Ms. Overbey was finishing a degree program for multi-skilled technicians at Baltimore City Community College and lived in an apartment, which she lost due to the incident with BPD.  Although the State immediately dropped the charges and declined to prosecute Ms. Overbey, she could not have the arrest expunged from her criminal record if she wanted to proceed with a civil suit against the City and BPD.  As a result, employers were unwilling to hire Ms. Overbey, and she remained homeless.  At the time she relented and agreed to sign the Settlement Agreement, she had been unemployed and homeless for two years.

103.    Because the gag order violates both the spirit and letter of the First Amendment and the public policy of Maryland, it is unlawful and void *ab initio*.

### COUNT IV

**Declaratory Judgment – Unlawful Liquidated Damages**
(by Ms. Overbey)

104.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

105.    A liquidated damages provision will be held to violate public policy, and hence will not be enforced, when it is intended to punish, or has the effect of punishing, a party for breaching the contract, or when there is a large disparity between the amount payable under the provision and the actual damages likely to be caused by a breach, so that it in effect seeks to

coerce performance of the underlying agreement by penalizing nonperformance and making a breach prohibitively and unreasonably costly.

106.    The provision permitting the City to collect a "refund" of 50 percent of the Settlement Sum ($31,500.00) from the Releasing Party is an unenforceable liquidated damages provision.

107.    The City never made any credible effort to estimate what, if any reasonable damages the City would incur as a result of Ms. Overbey's breach of the Agreement.   No reasonable method was employed in affixing the percentage amount that the City would claw back if a breach occurred.   Rather, the mandate in Paragraph 9 serves as a penalty and is a punitive measure aimed at discouraging and preventing Ms. Overbey, and others in her position, from disclosing any details or facts about her case.   Rather than compensate the City for any loss it could foreseeably incur from Ms. Overbey's disclosure, recouping 50 percent of Ms. Overbey's settlement proceeds merely punished Ms. Overbey for making public comments.

108.    Furthermore, 50 percent of Ms. Overbey's settlement amount is excessive and out of proportion to the damages that might reasonably have been expected to result from a breach of the Agreement.

109.    As such, the provision of the Agreement on which the City based its withholding of half the settlement proceeds is an illegal penalty and is void and unenforceable.

## COUNT V

### Breach of Contract
(by Ms. Overbey)

110.    Plaintiffs incorporate by reference the preceding paragraphs as if fully set forth herein.

111.    Section 2 of the Agreement required the City to make "the sum total payment to Ms. Overbey of Sixty-Three Thousand Dollars ($63,000)" within sixty (60) days of the approval of the Agreement.   The Agreement *did not* permit the City to unilaterally withhold from Ms. Overbey any portion of this award upon a breach of the Agreement.   Instead it expressly provided that (1) the City would pay Ms. Overbey in total, and (2) the City could seek a "refund" of 50 percent of the settlement amount upon a violation of Section 9.

112.    A refund means "to return (money) in restitution, payment, or balancing of accounts."[24]  Thus, the Agreement expressly contemplated that the City would disburse the total settlement amount, and could seek to recoup that amount if a violation of the Agreement occurred.

113.    The failure to follow this procedure was in breach of the Agreement and harmed Ms. Overbey in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

a) Enter judgment in favor of Plaintiffs Overbey and Baltimore Brew against Defendants;

b) Declare, pursuant to 28 U.S.C. §§ 2201–2202, that the City's gag order is illegal, unenforceable, and unconstitutional under the First Amendment of the United States Constitution and void as against public policy.

c) Declare, pursuant to the Maryland Declaratory Judgment Act, or alternatively, the federal Declaratory Judgment Act, that the gag order includes an unenforceable liquidated damages provision;

---

[24] *See* Merriam-Webster Dictionary, *http://www.merriam-webster.com/dictionary /refund* (last visited June 28, 2017).

d)  Order the City to remit the $31,500, plus interest, it is withholding from Ms. Overbey;

e)  Enjoin Defendants from further use of or reliance on the gag order;

f)  Award such other and further relief as may be just and equitable in the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims for which there is a right to jury trial.

Dated:  June 29, 2017

/s/ Deborah Jeon
Of Counsel
Deborah Jeon (USD MD No. 06905)
Nicholas Steiner (USD MD No. 19670)
ACLU of Maryland
3600 Clipper Mill Rd, Suite 350
Baltimore, MD 21211
Telephone: (410) 889-8555
Fax:  (410) 366-7838
jeon@aclu-md.org
steiner@aclu-md.org

/s/ Daniel W. Wolff
Daniel W. Wolff (USDC MD No. 19940)
Benjamin Wastler
Nkechi Kanu
Tyler O'Connor
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: (202) 624-2500
Fax:  (202) 628-5116
dwolff@crowell.com
bwastler@crowell.com
nkanu@crowell.com
toconnor@crowell.com

*Attorneys for Plaintiffs Ashley Amaris Overbey and Baltimore Brew*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 29, 2017, a copy of the Complaint, which was electronically

filed in this case on June 29, 2017, was mailed via first class mail, postage prepaid, to:

The Mayor and City Council of Baltimore,
Baltimore City Hall
100 Holliday St.
Baltimore, MD 21202

Baltimore City Police Department
242 W. 29th St.
Baltimore, MD 21211-2908

Respectfully submitted,

| | |
|---|---|
| /s/ Deborah Jeon | /s/ Daniel W. Wolff |
| Of Counsel | Daniel W. Wolff (USDC MD No. 19940) |
| Deborah Jeon (USD MD No. 06905) | Benjamin Wastler |
| Nicholas Steiner (USD MD No. 19670) | Nkechi Kanu |
| ACLU of Maryland | Tyler O'Connor |
| 3600 Clipper Mill Rd, Suite 350 | Crowell & Moring LLP |
| Baltimore, MD 21211 | 1001 Pennsylvania Avenue, NW |
| Telephone: (410) 889-8555 | Washington, DC 20004 |
| Fax:  (410) 366-7838 | Telephone: (202) 624-2500 |
| jeon@aclu-md.org | Fax:  (202) 628-5116 |
| steiner@aclu-md.org | dwolff@crowell.com |
| | bwastler@crowell.com |
| | nkanu@crowell.com |
| | toconnor@crowell.com |

***Attorneys for Plaintiffs Ashley Amaris
Overbey and Baltimore Brew***

Dated:  June 29, 2017