# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| ASHLEY AMARIS OVERBEY, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BALTIMORE BREW | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-1793 |
| | ) | Judge J. Frederick Motz |
| THE MAYOR AND CITY COUNCIL OF | ) | |
| BALTIMORE, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BALTIMORE CITY POLICE DEPARTMENT | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND THE MAYOR AND CITY COUNCIL OF BALTIMORE'S ALTERNATIVE MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE JURY DEMAND

Daniel W. Wolff (No. 19940)
Benjamin C. Wastler
Nkechi Kanu
Tyler O'Connor
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
dwolff@crowell.com
bwastler@crowell.com
nkanu@crowell.com
toconnor@crowell.com
Telephone: (202) 624-2500
Fax: (202) 628-5116

*Attorneys for Plaintiffs Ashley Overbey and Baltimore Brew*

September 1, 2017

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW ...................................................................................... 5

FACTS ................................................................................................................ 5

      A.     Ms. Ashley Overbey .............................................................. 6

      B.     Baltimore Brew .................................................................... 9

ARGUMENT ........................................................................................................ 9

   I.    The City Violated Plaintiffs' First Amendment Rights. ......................... 9

      A.     The Right to Speak Out About, and Report on, Government Infringements on Civil Rights Is at the Pinnacle of Protected Speech. ................................................................................ 9

      B.     The Gag Order in the City of Baltimore's Settlement Agreement with Ms. Overbey Infringed on Her First Amendment Rights. ............... 11

           1.     Standard for Reviewing the Waiver of Constitutional Rights. ...................................................................... 13

           2.     Ms. Overbey Did Not Understand the Consequences of the Gag Order. ............................................................... 14

           3.     The Gag Order Was a Product of Unequal Bargaining Power. ..................................................................... 17

           4.     The Gag Order Undermines the Accountability and Operation of the Baltimore Police Department. ......................... 19

           5.     The City's Justification for the Gag Order Is Nonsensical, Is Not Narrowly Tailored To Satisfy a Legitimate Government Policy, and Thus Cannot Overcome the First Amendment Harms It Causes. .................... 22

      C.     The Gag Order Violates Baltimore Brew's First Amendment Right To Gather News and Receive Protected Speech ........................... 25

           1.     Baltimore Brew Has Standing To Challenge the Gag Order...... 25

2.    The Gag Order Is Vague, Ambiguous, Overbroad and
Not Narrowly Tailored to a Compelling
Government Interest ……………………………………… 28

II.    The Agreement Violates Maryland Public Policy and Contains an
Unlawful Liquidated Damages Provision.............................................. 30

A.    The Gag Order Violates Maryland Public Policy .................................... 30

B.    The Settlement Contains an Unenforceable Liquidated Damages
Provision ..................................................................................... 32

C.    It Is Premature To Dismiss the Baltimore Police Department
from This Case ............................................................................. 35

CONCLUSION................................................................................................. 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Atl. Leasing & Fin., Inc. v. IPM Tech., Inc.*,
885 F.2d 188 (4th Cir. 1989) .......................................................................18

*Baltimore Sun Co. v. Mayor & City Council of Baltimore*,
359 Md. 653, 755 A.2d 1130 (2000) ...........................................................31

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................5

*Bowen v. Davidson*,
135 Md. App. 152, 761 A.2d 1013 (2000)....................................................31

*Branzburg v. Hayes*,
408 U.S. 665 (1972)......................................................................................25

*CBS v. Young*,
522 F.2d 234 (6th Cir. 1975) ............................................................26, 27, 29

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)........................................................................................5

*Citizens United v. FEC*,
558 U.S. 310 (2010)......................................................................................26

*Cromer v. Brown*,
88 F.3d 1315 (4th Cir. 1996) ......................................................................19

*D.H. Overmyer Co., Inc. of Ohio v. Frick Co.*,
405 U.S. 174 (1972)..............................................................14, 16, 17, 18

*Davies v. Grossmont Union High Sch. Dist.*,
930 F.2d 1390 (9th Cir. 1991) .........................................................14, 19, 23

*Davis v. E. Baton Rouge Parish Sch. Bd.*,
78 F.3d 920 (5th Cir. 1996) .......................................................25, 27, 28, 29

*Erie Telecomms. Inc. v. City of Erie*,
853 F.2d 1084 (3d Cir. 1988)...........................................................13, 14, 17

*Evans v. Techs. Applications & Serv. Co.*,
80 F.3d 954 (4th Cir. 1996) ...........................................................................5

*In re Express–News Corp.*,
  695 F.2d 807 (5th Cir. 1982) ...................................................................28

*Fed. Election Comm'n v. Wis. Right to Life, Inc.*,
  551 U.S. 449 (2007)...............................................................................4

*Garcetti v. Ceballos*,
  547 U.S. 410 (2006)..............................................................................11

*Globe Newspaper v. Superior Court*,
  457 U.S. 596 (1982)..............................................................................28

*Goldman v. Connecticut Gen. Life Ins. Co.*,
  251 Md. 575, 248 A.2d 154 (1968) .........................................................35

*Horton v. Wexford Health Sources, Inc.*,
  2016 WL 6662251 (D. Md. Nov. 10, 2016) ................................................5

*In re Application of Dow Jones & Co.*,
  842 F.2d 603 (2d. Cir. 1988).................................................................28

*In re Woods, Weeks & Co.*,
  52 Md. 520, 537 (1879) .........................................................................30

*Jordan v. Fox, Rothschild, O'Brien & Frankel*,
  20 F.3d 1250 (3d Cir. 1994)...................................................................14

*Lake James Cmty. Fire Dep't v. Burke Cnty.*,
  149 F.3d 277 (4th Cir. 1988) .......................................................14, 17, 19

*Lee Oldsmobile v. Kaiden*,
  32 Md. App. 556, 363 A.2d. 270 (1976)...................................................33

*Leonard v. Clark*,
  12 F.3d 885 (9th Cir. 1993), *as amended* (Mar. 8, 1994) ........................20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992)..............................................................................25

*Manning v. Mercatani*,
  898 F. Supp. 2d 850 (D. Md. 2012) ........................................................17

*Maryland.-National Capital Park & Planning Commission. v. Washington
  National Arena*,
  282 Md. 588, 605-07, 386 A.2d 1216, 1228-29 (1978).............................30

*Maryland Dep't of State Police v. Maryland State Conf. of NAACP Branches*,
190 Md. App. 359, 988 A.2d 1075 (2010), *aff'd*, 430 Md. 179, 59 A.3d 1037
(2013) ....................................................................................................................31

*Monsoor v. Trank*,
319 F.3d 133 (4th Cir. 2003) ..............................................................................14

*Mylan Labs., Inc. v. Matkari*,
7 F.3d 1130 (4th Cir. 1993) ...................................................................................5

*NAACP v. Button*,
371 U.S. 415 (1963) ................................................................................................4

*Near v. Minnesota*,
283 U.S. 697, 716–17 (1931) ...............................................................................10

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ..............................................................................................11

*New York Times Co. v. United States*,
403 U.S. 713 (1971) ........................................................................................10, 11

*Nucor Corp. v. Bell*,
482 F. Supp. 2d 714 (D.S.C. 2007) ......................................................................32

*Palko v. State of Connecticut*,
302 U.S. 319 (1937), *overruled on other grounds by Benton v. Maryland*, 395
U.S. 784 (1969) .......................................................................................................9

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015) ................................................................................12, 13, 23

*Roth v. United States*,
354 U.S. 476 (1957) ..............................................................................................11

*Snyder v. Phelps*,
562 U.S. 443 (2011) ..............................................................................................19

*Spradlin v. City of Owasso*,
No. 12-CV-497-JED-FHM, 2014 WL 1664974 (N.D. Okla. Apr. 25, 2014) ........32

*Stromberg v. California*,
283 U.S. 359 (1931) ..............................................................................................10

*United States v. Nat'l Treasury Emps. Union*,
513 U.S. 454 (1995) ..............................................................................................26

*Whitney v. California*,
   274 U.S. 357 (1927), *overruled in part on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969) ................................................................................10, 21

*Wikimedia Found. v. Nat'l Sec. Agency*,
   857 F.3d 193 (4th Cir. 2017) .............................................................................25

*Willard Packaging Co., Inc. v. Javier*,
   169 Md. App. 109, 899 A.2d 940 (2006) .......................................................33, 34

**Other Authorities**

Cato Institute's National Police Misconduct Reporting Project, Cato Institute,
   https://www.policemisconduct.net/explainers/transparency-in-law-
   enforcement/ (last visited August 25, 2017) ......................................................12

Fed. R. Civ. P. 56(a) ....................................................................................................5

Fed. R. Civ. P. 12(b)(6) ..............................................................................................14

Justin Carissimo, *34 Baltimore Cases Dismissed After Video Appears To Show
   Officer Planting Drugs*, CBS News (July 29, 2017), *available at*
   https://www.cbsnews.com/news/body-cam-video-baltimore-police-
   department-officer-planted-drugs-cases-dropped/ ............................................. 31

Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914) ...............2, 21

Press Release, U.S. Dep't of Justice, Justice Department Reaches Agreement with
   City of Baltimore to Reform Police Department's Unconstitutional Practices
   (Jan. 12, 2017), https://www.justice.gov/opa/pr/justice-department-reaches-
   agreement-city-baltimore-reform-police-department-s .....................................3, 31

Scott Calvert & Zusha Elinson, *Violating Baltimore's Deal Restrictions Can Be
   Costly*, Wall St. J., Oct. 19, 2015 .....................................................................3, 30

U.S. Dep't of Justice, Civil Rights Division, Investigation of the Baltimore City
   Police Dep't 8, 10 (2016), https://www.justice.gov/opa/file/883366/download ............. *passim*

The right of citizens to speak critically of the government and the right of the press to investigate the conduct of the government without undue restraints lay at the foundation of the First Amendment.  The City of Baltimore and its Police Department (collectively, "the City") systematically violate the First Amendment by punishing victims of police brutality who, like Plaintiff Ashley Overbey, do nothing more than defend themselves in a public space about the facts of their encounters with the Police Department.  By coercing other victims into maintaining silence against their free will, the City also systematically violates the First Amendment rights of news media outlets, such as Plaintiff Baltimore Brew, by preventing them from freely reporting on police brutality.

Neither the City's nor the Police Department's respective motions to dismiss have merit. The majority of this response is focused on the City's motion; the Police Department's separate motion is addressed toward the end.  For the reasons set out below, they should both be denied.

## INTRODUCTION

Baltimore and its Police Department are in a state of crisis owing to the City's fraught and, at times, explosive relationship between the Police Department and Black communities. That crisis is stoked and exacerbated by the subject of this lawsuit:  the City's unconstitutional restraint of those civil liberties which our Founders placed first among the Bill of Rights—the freedoms of speech and the press.

In different, but related, ways, Plaintiffs Ashley Overbey and Baltimore Brew are victims of the City's crisis, which the City's motion to dismiss and alternative motion for summary judgment only serve, by its tone and objective, to perpetuate.  The City would have this Court ignore the role that the City's gag order on victims of police brutality plays in this crisis.  And the City would have this Court ignore the role of the gag order in the larger pattern and practice, intentional or not, of stifling public and press access in cases of police brutality.  The City would

also have this Court turn a blind eye to the connection between Ms. Overbey's personal story of being brutalized and the larger tapestry of mistrust and brutality between police departments and Black communities that occurs every day in Baltimore and across the nation.

The Court should not indulge the City's invitation to ignore what in fact is going on here. The First Amendment—its protection of speech and press freedoms—is concerned first and foremost, from our country's earliest days, with shining a light on the government's treatment of the People. *See* Louis D. Brandeis, *Other People's Money and How the Bankers Use It* 92 (1914).

The City would have the Court ignore it, but context matters in discerning how the City's conduct infringes on Plaintiffs' First Amendment rights. The people of Baltimore and the nation at large were horrified by the 2015 death of Freddie Gray, whose senseless death caused by injuries sustained while in police custody is emblematic of the City's crisis. That was just one of countless incidents of police brutality that occur at an alarming rate in Baltimore and across the United States. The gag order espoused and imposed by the City throws gas on the fire. Silence is neither the answer nor consonant with the First Amendment, particularly with respect to the physical abuse and discrimination suffered by Black Americans at the hands of the police.

Indeed, at a time when many major cities across the United States are pursuing reforms to law enforcement policies and seeking to rebuild trust between police departments and the communities they serve, Baltimore and its Police Department are actively resisting change and doubling down on a culture of secrecy. A recent investigation and report by the United States Department of Justice ("DOJ") concluded that the Baltimore Police Department ("Police Department") "engages in a pattern or practice of excessive force" and actively thwarts any attempts to investigate incidents of police brutality by "discourag[ing] complaints from being

filed, misclassify[ing] complaints to minimize their apparent severity, and conduct[ing] little or no investigation."[1]   The DOJ's investigation, which resulted in a consent decree, found that this pattern and practice of conduct "violates the First, Fourth and 14th Amendments of the Constitution as well as federal anti-discrimination laws."[2]

It is in this unfortunate context that Ms. Overbey found herself beaten and brutalized by the very Baltimore police officers whose help she sought when her house was burglarized. When she brought a civil action seeking recourse against those officers, she was offered a settlement agreement that contained a gag order—found in 95 percent of the City of Baltimore's settlements of police misconduct—that prevented her from speaking about the Police Department's conduct.[3]   Yes, she had counsel, but her lawyer's advice was not consonant with the interpretation of the gag order the City is advancing in this case, and the City itself never advised her of the breadth of the gag order as it *now* would have this Court interpret it.   The City knew that as a young mother who was homeless and of obviously limited means, Ms. Overbey would have little choice but to accept the conditions.   It was a contract of adhesion, pure and simple.   A short time later, when she was baited into defending her side of the story on a local blog, the City—who had not yet paid her settlement—claimed breach and withheld half of the

---

[1] U.S. Dep't of Justice, Civil Rights Division, Investigation of the Baltimore City Police Dep't 8, 10 (2016), https://www.justice.gov/opa/file/883366/download ("DOJ Report").

[2] Press Release, U.S. Dep't of Justice, Justice Department Reaches Agreement with City of Baltimore to Reform Police Department's Unconstitutional Practices (Jan. 12, 2017), https://www.justice.gov/opa/pr/justice-department-reaches-agreement-city-baltimore-reform-police-department-s.

[3] Scott Calvert & Zusha Elinson, *Violating Baltimore's Deal Restrictions Can Be Costly*, Wall St. J., Oct. 19, 2015, https://www.wsj.com/articles/violating-baltimores-deal-restrictions-can-be-costly-1445299401.

settlement proceeds.  In short, she was penalized for exercising her freedom to defend herself and speak out against the abuses she endured at the hands of government officers.

The City's widespread use of the gag order constitutes a pattern and practice of shielding police misconduct from public view.  There is no other *reasonable* explanation for it.  The gag order undermines the public trust and violates the First Amendment rights of both the victims of police brutality and the news agencies attempting to shine a light on the abuse.  The gag order either muzzles victims of police brutality (as Baltimore Brew has encountered, meaning their stories cannot be fully investigated or told by the press) or punishes them if they do speak (as happened to Ms. Overbey).  The impediment the gag order poses to the press ultimately prevents the public from having the opportunity to learn the full extent of the City's pattern and practice of excessive force, and to take action—political, social, legal—to stop it.  In this environment, the trust between the Police Department and the City's residents further frays, and senseless acts of police brutality continue, with insufficient accountability for the police, insufficient understanding by the public, and insufficient justice for the victims.

To all of this, the City says Ms. Overbey agreed to be gagged, so case closed.  But not so fast.  Government is not like the private sector:  it is called, writ large, to serve the People.  "'First Amendment freedoms need breathing space to survive.'"  *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 468–69 (2007) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).  Government may not, like private parties, impose restraints on speech under the subterfuge of a "settlement agreement."  It does not serve the public interest or any legitimate public policy to silence victims of police brutality with "hush money."  Ms. Overbey's right to speak and be heard, and Baltimore Brew's right to investigate and report on police brutality without impediments imposed or coerced by the government, are at the cornerstone of the

liberties protected by the First Amendment.  The City's motion, and the Police Department's separate motion, should both be denied.

## STANDARD OF REVIEW

The City has filed a motion to dismiss or, in the alternative, a motion for summary judgment.  The Police Department has filed its own motion to dismiss.  In ruling on the motions to dismiss, the Court must assume the truth of the facts as pled in the complaint, and give the benefit of all reasonable inferences to the Plaintiffs.  *See Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993).  A motion to dismiss must be denied where the complaint states a plausible claim for relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Summary judgment imposes a similarly high bar for the City to clear, especially given that it has been filed before the commencement of discovery.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (noting that summary judgment is appropriate "after adequate time for discovery"); *see also Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996) ("[C]ourts generally are concerned about granting summary judgment when the opposing party has not had a fair opportunity to discover essential information.").  The court should only grant summary judgement if there is no genuine dispute of material fact and the movant is entitled to summary judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In analyzing a summary judgment motion, the court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor . . . ."  *Horton v. Wexford Health Sources, Inc.*, 2016 WL 6662251 at *2 (D. Md. Nov. 10, 2016) (citation and internal quotation marks omitted).

## FACTS

The following recitation of facts is drawn from the allegations in the complaint.

### A.    Ms. Ashley Overbey

At 9:40 p.m. on April 30, 2012, twenty-five year old Ashley Overbey contacted the Police Department to report that her home had been burglarized and to ask for help.  Instead of receiving assistance, Ms. Overbey was brutalized at the hands of Baltimore Police Officers Fred Hannah, Martin Richardson, and Grant Galing.  Without provocation, the Officers slapped, punched, beat, and tased Ms. Overbey.  One officer arrested both Ms. Overbey and her elderly mother, telling Ms. Overbey "you talk too much, bitch" and letting Ms. Overbey's mother know that he thought she was a "stupid bitch."

Ms. Overbey suffered severe injuries as a result of being beaten, tased, tackled, choked, and handcuffed.  After receiving treatment at the hospital, Ms. Overbey was incarcerated for twenty-four hours and charged with six counts of assault and one count of resisting arrest.  The Office of the State's Attorney for Baltimore City declined to prosecute and dropped all charges against both Ms. Overbey and her mother, who had also been arrested.

Ms. Overbey and her mother, Jenean Kelly, filed a complaint in Circuit Court for Baltimore City against the City and the individual officers for false arrest and false imprisonment, battery, violation of the Maryland Declaration of rights, and malicious prosecution stemming from the wrongful arrest and physical abuse of April 30, 2012.  Although the charges against Ms. Overbey were dropped, she was unable to get her criminal record expunged at the time.  Unfortunately, that meant that employers would not hire her due to her "criminal" record.  Without a job, she was unable to afford rent, lost her home, and became homeless.  After two years of litigation and no end in sight, Ms. Overbey needed money; the pursuit of justice had become a privilege she could not afford.  So when the City offered Ms. Overbey $63,000 and Ms. Kelly $13,000 to settle their allegations, Ms. Overbey felt she had no

options—practically speaking—but to accept the tendered agreement ("Settlement Agreement" or the "Agreement") (City's Mot., Ex. 3 (ECF No. 11-4)).

The Settlement Agreement presented by the City included a gag order, central to this case, which stated as follows:

> It is understood and agreed by the Settling Parties that in exchange for the payment of the Settlement Sum by the Released Parties, the Releasing Party and that party's agents, representatives and attorneys shall strictly refrain from and avoid any attempt at defaming and/or disparaging the Released Parties, including each of the Released Parties' employees or agents regarding any matter related to, or arising from the Litigation or the Occurrence. Further, in exchange for the payment of the Settlement Sum by the Released Parties and because the allegations of the Occurrence and Litigation are disputed, the Settling Parties agree that the Releasing Party and his or her agents, representatives and attorneys, shall limit their public comments regarding the Litigation and the Occurrence to the fact that a satisfactory settlement occurred involving the Parties.  It is understood and agreed by the Settling Parties that this limitation on public statements shall include a prohibition against discussing any opinions, facts or allegations in any way connected to the Litigation or the Occurrence, or substance of any prior settlement offers or discussions *with the news media,* except that the Releasing Party's counsel may indicate that the Litigation has been settled to avoid the cost, time, expense and uncertainties of protracted litigation.
>
> The Settling Parties agree and understand that a breach of the obligations set forth in this Paragraph 9 is deemed by the Settling Parties to be a material breach of this Agreement for which the City is entitled to a refund of fifty percent (50%) of the Settlement Sum ($31,500.00) from the Releasing Party.  The remainder of the Settlement Sum and all other obligations of this Agreement shall remain in force.  If it is necessary for the City to pursue recovery in litigation of the refund it is entitled to under this paragraph, the City will be entitled to recover all reasonable attorneys fees, costs and expenses of such litigation from the Releasing Party.

(Emphasis added.)

Ms. Overbey was apprehensive about signing the Settlement Agreement, but given her dire financial situation, she felt like she had no other choice.  Ms. Overbey's attorney also

encouraged her to sign the Agreement.  When Ms. Overbey asked her attorney about the gag

order, he explained that it limited what Ms. Overbey *and the City* could say about the facts of her

case, and told Ms. Overbey that it only prevented her from making statements to reporters, not

that it forbid her right to discuss the facts of her case in any public forum.

Ms. Overbey was informed that she would receive her settlement payment several weeks

after signing the Settlement Agreement.  On September 10, 2014, City Solicitor George Nilson

sought approval for the settlement from the Board of Estimates.  Mr. Nilson told the Board of

Estimates at a public hearing that Ms. Overbey had been "hostile" and that she had gotten into a

"verbal confrontation" with the police; both of which are not true.  Five days later, on September

15, 2014, the *Baltimore Sun* published a front page article about the City's decision to settle Ms.

Overbey's case, featuring Ms. Overbey's mug shot from her wrongful arrest.  Ms. Overbey

became upset that Mr. Nilson made statements to the media that appeared to blame her for her

mistreatment by the police, and her distress was further stoked by comments made by readers of

the *Sun* on the newspaper's public blog accusing Ms. Overbey of initiating her arrest to receive a

payout from the City.  The comments portrayed Ms. Overbey as a poor, greedy Black woman

using her race to extract a big payment from the City.  Ms. Overbey responded to the comments

by citing the facts of her assault as alleged in her publicly available complaint.

On October 8, 2014, Ms. Overbey's attorney received a check payable to Ms. Overbey in

the amount of $31,500, which was only half of the agreed-upon settlement payment.  The letter

explained that Ms. Overbey was being penalized for responding to the commenter on the *Sun*'s

blog.  The City did not provide any notice or a hearing prior to withholding half of the settlement

amount from Ms. Overbey.  It unilaterally withheld her money.  After her lawyer took his share

of the full settlement amount, Ms. Overbey was left with just $11,000.

B.      **Baltimore Brew**

Baltimore Brew is an online news organization that began reporting on Police Department lawsuits and settlements involving allegations of police brutality in 2011.  Baltimore Brew obtains most of its information about those lawsuits and settlements by attending Board of Estimates meetings.  The Board of Estimates is required to approve any settlement by the Police Department for an amount exceeding $25,000.  After the Board of Estimates approves a settlement, the City releases a memorandum on each lawsuit which briefly describes the dispute and the amount approved by the Board.  In Baltimore Brew's experience, the description is based primarily on the officer's narrative as drafted by the Police Department's legal department. Then-City Solicitor George Nilson would discuss the terms of the settlement and the incident that gave rise to the settlement, but informed Baltimore Brew that as a matter of policy, police settlements prohibited plaintiffs from discussing their cases.  When Baltimore Brew would attempt to contact victims, it was stonewalled by victims who were afraid of violating the gag orders contained in their settlement agreements and losing their settlement payments.  As a result, the only "speech" Baltimore Brew can obtain from victims is limited to the contents of their complaints filed against the City.  From the City, the most Baltimore Brew can hope for is its one-sided version.

## ARGUMENT

I.      **THE CITY VIOLATED PLAINTIFFS' FIRST AMENDMENT RIGHTS.**

A.      **The Right to Speak Out About, and Report on, Government Infringements on Civil Rights Is at the Pinnacle of Protected Speech.**

The First Amendment right to freedom of speech has been referred to as "the matrix, the indispensable condition, of nearly every other . . . freedom."  *Palko v. State of Connecticut*, 302 U.S. 319, 326 (1937), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784 (1969).

That right does not stop at the doors of Baltimore City Hall.  The First Amendment in fact empowers Americans to comment on matters of public concern, particularly as those issues relate to the state's exercise of its power.[4]  It is through that discourse "that government may be responsive to the will of the people and that changes may be obtained by lawful means." *Stromberg v. California*, 283 U.S. 359, 369 (1931).

The Founding Fathers intended for the press to play an essential role in this process.  As explained in the seminal case of *Near v. Minnesota*, "[t]he conception of the liberty of the press in this country . . . broadened with the exigencies of the colonial period and with the efforts to secure freedom from oppressive administration.  That liberty was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officers and charges of official misconduct." 283 U.S. 697, 716–17 (1931).  Courts have repeatedly affirmed the right, often over protestation by the state itself, *see e.g., New York Times Co. v. United States*,

---

[4] As Justice Brandeis commented:

> Those who won our independence believed . . . that public discussion is a political duty; and that this should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones.  Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law-the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed.

*Whitney v. California*, 274 U.S. 357, 375–76 (1927), *overruled in part on other grounds by Brandenburg v. Ohio*, 395 U.S. 444 (1969).

403 U.S. 713 (1971) (invalidating the government's prior restraint on the publication of the

Pentagon Papers), because they understand that the role of the press is "to serve the governed,

not the governors." *Id.* at 717 (Black, J., concurring).

The City's use of gag orders to prevent victims of police brutality from discussing the

circumstances of their abuse runs counter to this "profound national commitment to the principle

that debate on public issues should be uninhibited, robust, and wide-open, and that it may well

include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public

officials." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  Exacting punishment

against those victims for engaging in protected speech is no less a violation of the First

Amendment than imposing a prior restraint on protected speech in the first instance.  *See id.*

(reversing a civil judgment against a newspaper for running an advertisement criticizing a public

official acting in his official capacity).  The gag orders not only punish the speaker, they impede

the public's right to be informed about the operation of its own institutions.  *See Garcetti v.*

*Ceballos*, 547 U.S. 410, 420 (2006) ("The interest at stake is as much the public's interest in

receiving informed opinion as it is the employee's own right to disseminate it[.]" (citation and

internal quotation marks omitted)).

The First Amendment "was fashioned to assure unfettered interchange of ideas for the

bringing about of political and social changes desired by the people." *Roth v. United States*,

354 U.S. 476, 484 (1957).  The City's habitual use of gag orders violates this fundamental

principle and so should be held unconstitutional.

**B.    The Gag Order in the City of Baltimore's Settlement Agreement with Ms.
        Overbey Infringed on Her First Amendment Rights.**

The Settlement Agreement between Ms. Overbey and the City deprived Ms. Overbey of

her constitutional right to speak freely by attempting to limit what she could say about the

circumstances of her case, and then by punishing her when she exercised her right to defend

herself from vicious personal attacks of fellow citizens ignorant of the circumstances of her case,

caused by the City's one-sided public statement about the matter.  Baltimore is one of the few

major municipalities that continues to insist on inserting gag orders in settlement agreements

with victims of police brutality.[5]  Perhaps unsurprisingly, the United States Department of

Justice identified the Baltimore Police Department as one of the least transparent and

accountable police departments in the country.[6]  The gag order is part-and-parcel to this this lack

of transparency and accountability.  It either prevents victims from speaking about their abuse at

the hands of the police or punishes them for doing so, and it undermines the transparency,

accountability and trust necessary to the effective operation of police departments.  Rather than

serving the public, these provisions only serve to protect police departments from public

scrutiny.

The City does not dispute that the gag order is included in about 95 percent of the City's

settlement provisions.  The gag order essentially operates as a de facto legal standard.  Under the

traditional test, this content-based restraint on speech is unconstitutional, inasmuch as it prohibits

(or punishes) speech at the zenith of the First Amendment's protections (about police brutality)

but is not narrowly tailored to serve a compelling government interest (as discussed further

below).  *See Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226-27 (2015) ("Government regulation

of speech is content based if a law applies to particular speech because of the topic discussed or

the idea or message expressed.").  But here, because the restraint comes packaged within a

---

[5] The Cato Institute's National Police Misconduct Reporting Project, Cato Institute,
https://www.policemisconduct.net/explainers/transparency-in-law-enforcement/ (last visited
August 25, 2017).

[6] *See generally* DOJ Report.

"settlement agreement," the City defends the constitutionality of the gag order on grounds that Ms. Overbey waived her First Amendment rights when she signed the Settlement Agreement. The City alleges, without factual support—and contrary to the pleadings, which must be accepted by the Court as true for purposes of ruling on the City's motion—that Ms. Overbey "knowingly" and "voluntarily" waived her First Amendment rights, and that the public benefits of enforcing the gag order—which the City only discusses in passing—outweigh its detrimental effects. But in fact, Ms. Overbey did not understand the gag order, and only acceded to the settlement terms presented by the City because she lacked the bargaining power—given that she was homeless and destitute—to negotiate with the City.

Further, the City fails to recognize that, as a governmental entity, it does not stand in the same shoes as a private defendant. It has higher responsibilities and obligations which preclude it from accomplishing by "settlement agreement" the type of restriction on speech it would be precluded from accomplishing by statute. And in the face of these First Amendment constraints — imposed on the City by operation of the Fourteenth Amendment[7]—the City has failed to sufficiently justify its continued insistence on the inclusion of these gag orders in settlements agreements in spite of the overwhelmingly negative impact they have on the public's ability to hold the Police Department and political leaders accountable.

### 1.    Standard for Reviewing the Waiver of Constitutional Rights.

The City concedes the gag order curtails Ms. Overbey's First Amendment right to freedom of speech, but maintains that she waived her rights by signing the Settlement Agreement. Although constitutional rights can be waived, courts are reluctant to reach that conclusion. *Erie Telecomms. Inc. v. City of Erie*, 853 F.2d 1084, 1095 (3d Cir. 1988) ("The

---

[7] *See Reed*, 135 S. Ct. at 2226.

Supreme Court has noted that waiver is ordinarily an intentional relinquishment of a known right or privilege, and has instructed courts to indulge in every reasonable presumption against waiver of fundamental constitutional rights and not to presume acquiescence in the loss of such rights.") (citations and internal quotation marks omitted).  A waiver is only enforceable if it was done "knowingly," "voluntarily," and if it does not undermine the relevant public interest.  *Lake James Cmty. Fire Dep't v. Burke Cnty.*, 149 F.3d 277, 280 (4th Cir. 1988).  In addressing this last prong, the Court balances the government's purported interest in enforcing the waiver against the public policy harmed by the waiver's enforcement.  *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1396 (9th Cir. 1991) (citation and internal quotation marks omitted).  *See also Lake James*, 149 F.3d at 282; *Monsoor v. Trank*, 319 F.3d 133, 139 n.4 (4th Cir. 2003).

Whether Ms. Overbey in fact "knowingly" and "voluntarily" waived her rights is a question of fact that cannot be resolved at this stage of the case.  *See Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1272 (3d Cir. 1994) ("[W]aiver is usually a question of fact.") (citing *D.H. Overmyer Co., Inc. of Ohio v. Frick Co.*, 405 U.S. 174, 188 (1972)).[8]  Whether the gag order violates public policy is a question of law appropriate for resolution by the Court on a motion to dismiss.  *See Davies*, 930 F.2d at 1396.

### 2.    Ms. Overbey Did Not Understand the Consequences of the Gag Order.

Courts only enforce a waiver of an individual's constitutional rights if "the facts and circumstances . . . make it clear that the party foregoing its rights has done so . . . *with full understanding of the consequences of its waiver.*"  *Erie Telecomms.*, 853 F.2d at 1096 (emphasis

---

[8] *See also Jordan*, 20 F.3d at 1273 ("[W]hether a [party] has effectively waived its right . . . may not often be subject to quick resolution on a Rule 12(b)(6) motion to dismiss.").

added).  Ms. Overbey was penalized for commenting on a blog post about her case.  As

explained in the complaint and Ms. Overbey's declaration accompanying this opposition

("Overbey Dec.," attached hereto as Exhibit A), her understanding at the time she signed the

Settlement Agreement was that the gag order only prohibited her from talking to reporters, not

that it completely curtailed her ability to make public statements about her abuse at the hands of

the police.  As explained in the complaint:

> [A]gain relying on her attorney's explanation of the Agreement and of the gag
> order in particular, Ms. Overbey understood that the gag order prohibited the
> parties from speaking with *the media*, i.e., reporters who worked directly for
> television, radio, newspaper and internet outlets; Ms. Overbey did not appreciate
> at the time that, at least according to how the City later interpreted it, the
> Agreement prohibited her from discussing her case in any public forum, and that
> the prohibition against speaking publicly only applied to her, and not the City.

Compl. ¶ 54.

Ms. Overbey's declaration provides further explication of her state of mind at the time

she signed the Settlement Agreement.  Ms. Overbey stated:

> My lawyer explained that the gag order applied to both me and the City of
> Baltimore.  He also explained to me that it prohibited me from talking to the news
> media, which I understood to mean reporters who worked directly for television,
> radio, newspaper, and internet media outlets.  He did not explain to me that it
> prohibited me from talking to anyone, and I did not understand it to mean that
> when I read it.  He also did not try to take the gag order out of the Settlement
> Agreement in our negotiations with the City, and I didn't even know whether that
> was an option.   Furthermore, at no time did the City itself, or any of its
> representatives, offer any additional explanation of the gag order.

Overbey Dec. ¶ 4.

In the City's memorandum of law in support of its motion to dismiss or for summary

judgment, the City provides essentially two arguments as to why it believes Ms. Overbey

knowingly waived her First Amendment rights:  (1) it argues that the Settlement Agreement was

"simple and clear," City's Mot. (ECF No. 11-1), at 12; and (2) it points out that Ms. Overbey

was represented by counsel in signing the Settlement Agreement, *id.* at 13.

15

First, it is irrelevant whether opposing counsel believes the Settlement Agreement to be "simple and clear."  Opposing counsel has no personal knowledge of whether anything about the agreement was "simple" or "clear" to Ms. Overbey.  Stating it *ipse dixit* does not make it so. Ms. Overbey, in fact, has a much different point of view, and what matters for purposes of the Court's analysis at this stage of litigation is Ms. Overbey's understanding of the rights she was relinquishing at the time she signed the Settlement Agreement.  Ms. Overbey has unequivocally stated that she did not understand the gag order prevented her from publicly commenting on her case.  *See* Overbey Dec. ¶¶ 4, 9.

Second, Ms. Overbey's engagement of counsel during the settlement process is not probative of Ms. Overbey's state of mind at the time she signed the Settlement Agreement.  In fact, the complaint makes clear that her attorney advised her that the gag order meant something different from what the City now portrays.  *See* Compl. ¶ 54 ("[A]gain relying on her attorney's explanation of the Agreement and of the gag order in particular, Ms. Overbey understood that the gag order prohibited the parties from speaking with ***the media***, i.e., reporters who worked directly for television, radio, newspaper and internet outlets").  The City's argument is based on an apparent misreading of the Supreme Court's opinion in *D.H. Overmyer*, which the City believes supports its argument that representation by counsel is sufficient to demonstrate a knowing waiver of one's rights.  City's Mot. at 11 (citing *D.H. Overmyer Co., Inc. of Ohio v. Frick Co.*, 405 U.S. 174, 185–87 (1972)).  To the contrary, the Court in *D.H. Overmyer* explained that the Plaintiff's representation by counsel was only probative of the voluntary nature of the waiver in that case because the Plaintiff did "not contend here that it or its counsel was not aware of the significance of the [challenged] provision."  405 U.S. at 186.  Ms. Overbey,

16

in stark contrast, does "contend here that [she] was not aware of the significance of the [gag] provision." That contention has not been rebutted by the City.

Given the statements in the complaint and Ms. Overbey's Declaration, the City does not have a plausible basis for dismissal or summary judgment.[9]

### 3.    The Gag Order Was a Product of Unequal Bargaining Power.

Courts will not enforce a waiver of constitutional rights that is entered into involuntarily. *See Lake James*, 149 F.3d at 280.  A waiver is not voluntary if the contract of which it was a part was one of adhesion or a result of unequal bargaining power.  *See D.H. Overmyer*, 405 U.S. at 186; *Erie Telecomms., Inc.*, 853 F.2d at 1096 (a contract is voluntary if "the parties to the contract have bargaining equality and have negotiated the terms of the contract"); *Manning v. Mercatani*, 898 F. Supp. 2d 850, 863 (D. Md. 2012) ("[W]aivers may be suspect when there is a great disparity in bargaining power between the parties.") (internal quotation marks omitted). Material disputes of fact exist as to whether Ms. Overbey voluntarily entered into the Settlement Agreement.

Former City Solicitor George Nilson estimated that the City of Baltimore has included gag orders in roughly 95 percent of its settlement agreements with victims of police brutality since 2009, during which time it has paid more than $33.4 million to settle such lawsuits. Compl. ¶¶ 18-19.  The percentage of settlement agreements including gag orders may be even

---

[9] For the same reason identified above, the City's argument that the Settlement Agreement's inclusion of a provision titled "Knowing and Voluntary Act" somehow demonstrates Ms. Overbey's state of mind at the time she signed the Settlement Agreement is specious.  That provision, boilerplate, merely states that each party was represented by counsel in signing the Settlement Agreement and that the Settlement Agreement was entered into voluntarily.  It does not in fact say the Settlement Agreement was entered into "knowingly," and it does not describe the scope of First Amendment rights that Ms. Overbey believed she was signing away. Moreover, it was only upon having her proceeds withheld that she came to learn of the scope of her rights the City contends she waived.

higher.  The ubiquity of the provision suggests it is a non-negotiable component of the City's

settlement agreements with victims of police brutality, at least where (as is usually the case and

as was the case with Ms. Overbey) the victim lacks sophistication or competent counsel.

Certainly Ms. Overbey felt that way upon receiving a settlement proposal from the City which

included the gag order, and Mr. Nilson told Baltimore Brew that nearly all police settlements

with victims of police brutality include such provisions.  Compl. ¶ 19.  Moreover, Ms. Overbey

was homeless and destitute at the time she signed the Settlement Agreement, a direct result of

her unlawful arrest by the City, and therefore was not in the position to negotiate meaningfully

with the City.  The terms of the gag order itself (at least as the City construes it) exemplify the

unequal bargaining power between the City and Ms. Overbey; while the Settlement Agreement

prevented Ms. Overbey from publicly commenting on the dispute, it imposed no such limitation

on the City (something Ms. Overbey did not understand at the time she signed).  *See DH

Overmyer*, 405 U.S. at 186 (an agreement is involuntary if it is a product "of unequal bargaining

power or overreaching").  Ms. Overbey cannot be said to have voluntarily waived her First

Amendment rights given this unequal bargaining power.  *See Atl. Leasing & Fin., Inc. v. IPM

Tech., Inc.*, 885 F.2d 188, 192 (4th Cir. 1989).

   The City places dispositive weight on Ms. Overbey's representation by counsel.  But, in

fact, the allegations in the complaint (which the Court must presume to be true) evidence that

Ms. Overbey's attorney did not understand the gag order to mean what the City now contends it

means.  Compl. ¶ 54; *cf. Atl. Leasing*, 885 F.2d at 192 (lack of "competent legal counsel" is

evidence militating against a knowing and voluntary waiver of rights).  Further, the inclusion in

the Settlement Agreement of a provision indicating the Agreement was voluntary is irrelevant

where, as here, Ms. Overbey is alleging that the Agreement was one of adhesion and that she

lacked the ability to bargain over the Agreement's relevant terms.  The whole point is that she

lacked the bargaining power to negotiate out offending provisions of the City's settlement offer.

> **4.     The Gag Order Undermines the Accountability and Operation of the Baltimore Police Department.**

Freedom of speech is essential to holding our public institutions and leaders accountable.

For that reason citizens are vested with the right to speak on matters of public concern.  *See*

*Snyder v. Phelps*, 562 U.S. 443 (2011).  The City has systematically undermined that right for

the roughly 95 percent of victims of police brutality who are prevented from speaking about their

abuse at the hands of the police.  In so doing, the City undermines the accountability and

transparency that is necessary to the effective operation of the Police Department, and has

created a culture within and outside the Police Department that shields itself and its members

from scrutiny.  Continuing to enforce these gag orders will only exacerbate the problem.

Courts will not enforce waivers of constitutional rights, such as the gag order in this case,

when the benefits of enforcement are outweighed by the detriments.  *See Davies*, 930 F.2d at

1396 (a waiver of constitutional rights is "unenforceable if the interest in its enforcement is

outweighed in the circumstances by a public policy harmed by the enforcement of the

agreement.").  The Fourth Circuit has held that the effective operation of public services, such as

fire and police departments, is a "strong public policy."  *See Lake James*, 149 F.3d at 281

("Effective and reliable fire protection service is by definition in the public interest.").  Likewise,

it has held that speaking on issues regarding racial discrimination in police departments is a

matter of public concern.  *See Cromer v. Brown*, 88 F.3d 1315, 1326 (4th Cir. 1996).  The gag

order in this case undermines the effective operation of the Police Department by undermining

the public's ability to hold the department accountable for misconduct, particularly in the African

American community.  It also undermines the victims' rights to speak on a matter of public

concern while shielding the public from information necessary to hold its public officials accountable. *See Leonard v. Clark*, 12 F.3d 885, 891 (9th Cir. 1993), *as amended* (Mar. 8, 1994) ("As the Union notes, the right . . . to speak on matters of public concern has long been recognized to be a fundamental right of critical importance." (internal quotation marks omitted)).

The state of policing in the City of Baltimore is at its nadir.  On August 10, 2016, the United States Department of Justice Civil Rights Division released the results of its "Investigation of the Baltimore City Police Department" which concluded that the City of Baltimore engages in a "pattern or practice" of "(1) making unconstitutional stops, searches, and arrests; (2) using enforcement strategies that produce severe and unjustified disparities in the rates of stops, searches, and arrests of African Americans; (3) using excessive force; and (4) retaliating against people engaging in constitutionally-protected expression."  DOJ Report at 3. The DOJ Report is a damning indictment of policing in the City of Baltimore, and it specifically attributes the Department's continued inability to police "effectively and within the bounds of federal law" to a lack of accountability for police misconduct.  *Id.*

The City lacks both internal and external accountability systems, which in turn undermines the Police Department's standing in the Baltimore Community.  *See id.* at 147 ("[the Police Department's] accountability system is shielded almost entirely from public view, and the civilian oversight mechanisms that are currently in place are inadequate and ineffective.  These flaws damage the Department's legitimacy in the community.").  According to the report, these mechanisms particularly fail at deterring police misconduct:

> [the Police Department] lacks meaningful accountability systems to deter misconduct. The Department does not consistently classify, investigate, adjudicate, and document complaints of misconduct according to its own policies and accepted law enforcement standards. Instead, we found that [the Police Department] personnel discourage complaints from being filed, misclassify complaints to minimize their apparent severity, and conduct little or no

investigation. As a result, a resistance to accountability persists throughout much of [the Police Department], and many officers are reluctant to report misconduct for fear that doing so is fruitless and may provoke retaliation. The Department also lacks adequate civilian oversight—its Civilian Review Board is hampered by inadequate resources, and the agency's internal affairs and disciplinary process lacks transparency.

*Id.* at 10.

Furthermore, the Police Department does its best to sweep allegations of misconduct under the rug.  According to the DOJ Report, the Police Department "discourages members of the public from filing complaints" and creates "significant barriers to members of the Baltimore community who try to alert the Department to misconduct by its officers." *Id.* at 140.  When investigations into police misconduct are initiated, the Police Department regularly undermines those investigations by "fail[ing] to investigate complaints in a timely manner," "fail[ing] to adequately supervise investigations," and failing to impose consequences on individuals engaging in police misconduct. *Id*. at 140-45.  The Police Department also shields itself from the public at-large, as "community members are unable to obtain information about the Police Department's complaints and discipline system." *Id.* at 147.  And as we know, the City plays its part as well, requiring victims of police brutality who ultimately settle allegations of police misconduct to sign agreements preventing the victims from publicly discussing the facts of their case, short-circuiting the public discussion that is the bedrock of our society.  As Justice Brandeis said:  "Publicity is justly commended as a remedy for social and industrial diseases. Sunlight is said to be the best of disinfectants; electric light the most efficient policeman."[10] Unfortunately, the City of Baltimore has not heeded this admonishment, which has only

---

[10] Brandeis, at 92 (1914).  *E.g.*, *Whitney*, 274 U.S. at 375–76.

"heighten[ed] community perceptions that [the Police Department] is resistant to accountability." DOJ Report at 148.

The City's reliance on gag orders to prevent victims of police misconduct from speaking about their cases is just another way the City throws sand in the gears of any process that could hold the Police Department accountable.  The City concedes in its brief that "it is in the public's interest to hear about possible police misconduct," but all of the City's actions indicate it does everything possible to prevent public accountability.  *See* City Mot. at 16.  That "persistent failure to hold officers accountable for misconduct contributes to an erosion of the community trust that is central to effective law enforcement."  DOJ Report at 139.  This is particularly the case within the African-American community, where the "targeted policing of certain Baltimore neighborhoods with minimal oversight or accountability disproportionately harms African-American residents."  DOJ Report at 7.

> ### 5.      The City's Justification for the Gag Order Is Nonsensical, Is Not Narrowly Tailored To Satisfy a Legitimate Government Policy, and Thus Cannot Overcome the First Amendment Harms It Causes.

Despite these impacts the City continues to defend the gag policy by reference to the City's countervailing interest in "avoiding the time and expense of litigation." According to the City:

> Without a commitment from Ms. Overbey not to publicly speak on certain, disputed aspects of her litigation, the City and the Officers would not have had any reasonable assurance of closure.  Ms. Overbey would have been able to pursue a trial in the court of public opinion, despite having settled her claims.

City's Mot. at 18.

But the purported benefit of the gag order is illusory.  Ms. Overbey is not challenging the Settlement Agreement *in toto*, but merely the gag order that appears—as the City does not dispute—in approximately 95 percent of the City's settlement agreements that prevents victims

from speaking about the facts of their case.  The gag order itself is not the mechanism in the

settlement that "avoids the time and expense of litigation," and its removal would not impact the

finality of Ms. Overbey's suit against the City for police misconduct.[11]  Nor does the gag order

provide any measure of "closure."  It was Ms. Overbey's agreement to drop her civil rights

lawsuit and waive any future action against the City for the brutality she endured that brought

closure.  The gag order added nothing to "closure"; it only serviced the City's objective of

"silence" from Ms. Overbey.  That is not a policy worth preserving and certainly not narrowly

tailored to serve a legitimate objective.  *See Reed*, 135 S. Ct. at 2231.

Nor did the gag order prevent the City and the Police Department from commenting on

Ms. Overbey's case and pursuing "a trial in the court of public opinion," so the City's invocation

of "closure" is sanctimonious.  In fact, shortly after her settlement with the City, City Solicitor

Nilson made comments to the media that appeared to blame Ms. Overbey for her mistreatment

by the police.  Compl. ¶ 60.  The City's appeal to wanting "closure" is insincere.

The City also argues that Ms. Overbey's First Amendment rights cannot have been

violated because no "willing speaker" exists to exercise those rights.  This makes no sense.  Ms.

Overbey herself is the willing speaker.  She is the one asserting a First Amendment claim; she is

---

[11]The City's interest in "finality" and "closure" is just a way of restating the government's
interest in the enforcement of settlement agreements.  The Ninth Circuit addressed the
government's purported interest in the enforcement of settlement agreements in *Davies v.
Grossmont*. It explained that:

> [I] t is an interest that will be present in every dispute over the enforceability of an
> agreement terminating litigation. In a case presenting no public interest that would
> be harmed by enforcement of the waiver provision, the countervailing interest in
> settlement will be enough to justify enforcement. But where a substantial public
> interest favoring nonenforcement is present, the interest in settlement is
> insufficient.

930 F.2d at 1398.

23

the one who was not permitted to speak under the terms of the gag order; and she is the one who was penalized when the City withheld over $30,000, when she allegedly violated the gag order. To the extent the City believes Ms. Overbey and everyone else who signed these agreements were genuinely content not to speak further about the cases of police brutality they endured, it may pursue that line of questioning in discovery, but for present purposes, there is, at the very least, a genuine issue of material fact which cannot be resolved on the City's motion.

The City further argues that Ms. Overbey remained free to talk publicly about "any other instances" of police brutality, so no harm done.  This, too, makes no sense.  It was *her experience* that she was called upon to address when provoked by online aspersions about her character – aspersions that had been stoked in part by the City's own one-sided public statement about her case.  That she was not silenced as to all speech does not ameliorate the First Amendment violation owing to her being punished for speaking about the facts she knew best, to wit, her own encounter with police brutality.

In the absence of any justifiable reason supporting the enforcement of the gag order, it should be struck down as an impermissible constraint on Ms. Overbey's First Amendment rights and a policy that undermines the effective operation of the Police Department.[12]

---

[12] The City expresses concern that a ruling for Ms. Overbey would call into question "all settlement agreements" between the City and "parties of low economic status."  City's Mot. at 14.  This both overstates in part and understates in part the Plaintiffs' position.  As noted above, nothing calls into question "all settlement agreements."  The settlement agreements are fine so far as "settlement" of civil actions go, so that much is overstated by the City.  The only aspect of the agreement at issue in this case is the gag order, which (as addressed above) serves no legitimate purpose.  Whether the agreement is with "parties of low economic status" is irrelevant. The City could settle with a sophisticated millionaire and the gag order would still run afoul of the First Amendment because the asserted basis for doing so—"closure"—is not sincere and does not justify the restraint on speech, so that much is understated by the City.  Common sense dictates that citizens of greater economic means may well have less incentive to accede to the (Continued...)

**C.      The Gag Order Violates Baltimore Brew's First Amendment Right To Gather News and Receive Protected Speech**

Baltimore Brew is an independent news organization that specializes in government accountability reporting and city services.  As such, it actively seeks out the facts underlying any lawsuits that stem from incidents of police brutality.  Baltimore Brew is stymied from reporting on this significant matter of public concern, however, by gag orders implemented by the City that inhibit victims of police brutality from speaking about beatings they suffered the hands of the police.  The City contends, erroneously, that Baltimore Brew lacks standing to challenge the City's widespread use of gag orders in settlement agreements because it cannot allege an injury in fact.  City's Mot. at 21.

**1.      Baltimore Brew Has Standing To Challenge the Gag Order**

"To establish standing, a plaintiff must show:  (1) an injury in fact; (2) a sufficient causal connection between the injury and the conduct complained of; and (3) a likelihood that the injury will be redressed by a favorable decision." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 207 (4th Cir. 2017) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)).  Here, Baltimore Brew satisfies all three elements of the standing test.  First, Baltimore Brew has suffered injury because the gag order significantly impairs Baltimore Brew's "abilities to gather the news and to receive protected speech" about incidents of police brutality.  *See Davis v. E. Baton Rouge Parish Sch. Bd.*, 78 F.3d 920, 927 (5th Cir. 1996).  The Supreme Court has consistently recognized that news gathering qualifies for First Amendment protections.  *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("Without some protection for seeking out the news, freedom of the press could be eviscerated.").  The First Amendment guarantee of freedom

_____

City's unconstitutional terms, but that only serves to highlight further how the City's unconstitutional conduct has a disproportionate impact on the City's poorer residents.

of the press is "not a device to give the press a favored status in society," but to prevent

government restrictions that "might prevent such free and general discussion of public matters as

seems absolutely essential to prepare the people for an intelligent exercise of their rights as

citizens." *CBS v. Young*, 522 F.2d 234, 238 (6th Cir. 1975) (internal quotation marks omitted).

As discussed above, the scourge of police brutality persists in Baltimore in part because the

City's gag order policy impedes an open public discourse about the significant harm such

incidents enact on the community. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S.

454, 470 (1995) (finding a ban on government employees' receipt of honoraria constituted a

"large-scale disincentive to [g]overnment employees' expression" and "impose[d] a significant

burden on the public's right to read and hear what the employees would otherwise have written

and said").

     The City's argument that Baltimore Brew cannot allege an injury in fact because its

reporting on the general actions by the City and the Police Department has not been "chilled"

hinges on a faulty premise. City's Mot. at 21. The injury Baltimore Brew suffers is the

restriction of access to specific and essential sources of information—the victims of police

brutality—by the gag order, not any form of self-censorship. The City is attacking a straw man.

     Moreover, the City's contention that Baltimore Brew can still get its news from other

sources and continue to publish stories about police brutality (City's Mot. at 17, 21) is irrelevant.

A restriction on protected speech violates the First Amendment even if it does not completely, or

even significantly, curtail the message. *See Citizens United v. FEC*, 558 U.S. 310, 356 (2010)

("When Government seeks to use its full power . . . to command where a person may get his or

her information or what distrusted source he or she may not hear, it uses censorship to control

thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.");

*Nat'l Treasury Emps. Union*, 513 U.S. at 468 (1995) ("Although [an honoraria ban] neither prohibits any speech nor discriminates among speakers based on the content or viewpoint of their messages, its prohibition on compensation unquestionably imposes a significant burden on expressive activity. . . .").

Second, the injury suffered by Baltimore Brew is "fairly traceable" to the gag order at issue in this case in that Baltimore Brew's inability to access essential sources of information about incidents of police brutality—the victims themselves—is directly caused by the gag order. *Davis*, 78 F.3d at 926; *CBS*, 522 F.2d at 237–38 (6th Cir. 1975) (finding that news agency had standing where it was "effectively cut off from any access whatever to important sources information about [a] trial"). Third, the relief requested by Baltimore Brew—invalidation of the gag order—would redress the injury by allowing Baltimore Brew to discover information from the victims of police brutality. *Davis*, 78 F.3d at 927.

The impact of the gag order on Baltimore Brew's ability to gather news and receive speech is analogous to the injury suffered by the plaintiff television network in *CBS v. Young*, where a court order prohibited "all parties concerned" with consolidated wrongful death actions resulting from clashes between student protesters and the Ohio National Guard from "discussing in any manner whatsoever these cases with members of the news media or the public." 522 F.2d at 237–39. Although plaintiff CBS was neither a party to the wrongful death actions nor a specific target of the restrictive order enjoining discussions about the cases, the court held that CBS's "protected right to publish the news would be of little value in the absence of sources from which to obtain it." *Id.* at 237–38. Consequently, CBS had standing to challenge the validity of the order. Similarly, in *Davis*, news agencies appealed a court order prohibiting the local school board, attorneys, and employees of the local school district from publicly

27

commenting about drafts of a school desegregation plan and requiring all meetings about the plan to remain private and confidential.  78 F.3d at 926.  Because the court order "severely impede[d]" the news agencies' "abilities to gather the news and to receive protected speech," they had standing to challenge the validity of the order.  *Id.* at 926–27.

2.  <strong>The Gag Order Is Vague, Ambiguous, Overbroad, and Not Narrowly Tailored to a Compelling Government Interest</strong>

While neither the First Amendment right to receive speech nor the First Amendment right to gather news is absolute, *Davis*, 78 F.3d at 928, restraints on news agencies' First Amendment rights "must still be justified."  *Id.*  ("To conclude that this is not a case of prior restraint of the press is not to say that the restraining order need not be justified.  On the contrary, it must be.") (citing *In re Application of Dow Jones & Co.*, 842 F.2d 603, 609 (2d. Cir. 1988)).  "[A]n inhibition of press news-gathering rights must be necessitated 'by a compelling governmental interest, and . . . narrowly tailored to serve that interest.'"  *In re Express-News Corp.*, 695 F.2d 807, 808–09 (5th Cir. 1982) (quoting *Globe Newspaper v. Superior Court,* 457 U.S. 596, 607 (1982)).

The gag order utterly fails in this regard in that it is vague, ambiguous, overbroad, and not narrowly tailored to serve a compelling government interest.  The gag order contained in Ms. Overbey's settlement agreement required her and her "agents, representatives and attorneys" to "limit their public comments regarding the Litigation and the Occurrence to the fact that a satisfactory settlement occurred between the Parties" and prohibited them from "discussing any opinions, facts or allegations in any way connected to the Litigation or the Occurrence, or substance of any prior settlement offers or discussions with the news media," except that her counsel could indicate that the litigation had been settled.

28

The gag order is inherently vague and ambiguous because it fails to define "public comments" and "news media," thereby providing Ms. Overbey with no meaningful guidance as to the context in which it was permissible for her to discuss her lawsuit or the underlying incidents. The gag order suffers equally from overbreadth in that it is not narrowly tailored to serve any compelling government interest. *See CBS*, 522 F.2d at 239 (finding overbreadth in order that permitted by "its literal terms no discussions whatever about the case . . . by the persons upon whom the ban is placed whether prejudicial or innocuous, whether subjective or objective, whether reportorial or interpretive"). In *Davis*, the court held that the court order prohibiting discussion of the school desegregation plan and requiring private confidential meetings about it was "not justified . . . by any important government interest or countervailing individual right." 78 F.3d at 928-29. Although school desegregation was a compelling government interest, the confidentiality order did not further that interest because "[t]he removal of the confidentiality order would in no way prevent the Board from desegregating the school system." *Id.* at 929.

Here, the only government interest that the City cites is the promotion of "the resolution of matters without the time, expense, and risk of litigation." City's Mot. at 15. The significance of promoting speedy resolution of litigation pales in comparison to the importance of the countervailing interest at issue in *CBS*, where the confidentiality order was intended to ensure the parties' right to a fair trial and avoid prejudicial or inflammatory publicity. The gag order here does not apply to a criminal trial, or even a civil trial, and there is "no possibility that publicity will prejudice potential jurors." *Davis*, 78 F.3d at 929. The City simply wants to prevent victims of police brutality from publicly sharing their stories of abuse at the hands of police.

29

Further, it is highly suspect whether the gag order is necessary for the speedy resolution of litigation.  Baltimore is "rare among large U.S. cities" in its persistent and widespread use of gag orders.[13]  In an October 2016 article that appeared in the Wall Street Journal, a spokesman for former Philadelphia Mayor Michael Nutter stated that "[t]here is generally not a need for such a clause."[14]  In the same article, a California attorney who defends police officers in civil cases explained that "including such clauses is seldom necessary because both sides usually lay down their swords after a settlement."

## II. THE AGREEMENT VIOLATES MARYLAND PUBLIC POLICY AND CONTAINS AN UNLAWFUL LIQUIDATED DAMAGES PROVISION.[15]

### A. The Gag Order Violates Maryland Public Policy

Even under the standard relied on by the City that is described in the decision in *Maryland.-National Capital Park & Planning Commission. v. Washington National Arena*, the gag order placed on Ms. Overbey violates Maryland public policy, and, therefore, voids that provision of the agreement.  282 Md. 588, 605-07, 386 A.2d 1216, 1228-29 (1978).  The articulated standard where contract provisions violate public policy, is when the "agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would . . . pronounce it' invalid."  *In re Woods, Weeks & Co.'s Estate*, 52 Md. 520, 537 (1879)

---

[13] Scott Calvert & Zusha Elinson, *Violating Baltimore's Deal Restrictions Can Be Costly*, Wall St. J., Oct. 19, 2015, https://www.wsj.com/articles/violating-baltimores-deal-restrictions-can-be-costly-1445299401.

[14] *Id.*

[15] The City contends that Ms. Overbey's contract-based claims are barred by the statute of limitations.  That is an affirmative defense that the City has the burden of proving.  Affirmative defenses aside, the City's violations are still worth considering, in equity if not in law, as further illumination on the injustice of its treatment of Ms. Overbey and the hundreds of other police misconduct victims pressured into agreeing to the same improper contract terms.

(quoting *Maryland-Nat'l Cap. Park & Plan. Comm'n*, 282 Md. at 606, 386 A.2d. at 1228).  This

standard has clearly been met in this case.

Maryland public policy promotes the disclosure of information related to the

administration of state and local services, particularly with respect to issues of public concern

and safety.  *See Bowen v. Davidson*, 135 Md. App. 152, 157, 761 A.2d 1013, 1016 (2000) (The

Maryland Public Information Act "establishes a public policy that favors disclosure of

government or public documents.").  *See also Baltimore Sun Co. v. Mayor & City Council of*

*Baltimore*, 359 Md. 653, 661, 755 A.2d 1130, 1134 (2000).  Transparency is necessary to hold

government officials accountable for misconduct, and the Maryland Public Information Act has

been the statutory public policy mechanism to provide access to the inner-workings and

"operation of [the peoples'] government."  *Maryland Dep't of State Police v. Maryland State*

*Conf. of NAACP Branches*, 190 Md. App. 359, 367, 988 A.2d 1075, 1079 (2010), *aff'd*, 430 Md.

179, 59 A.3d 1037 (2013).  The non-disparagement clause does in fact interfere with the

Maryland public policy of transparency by preventing full accountability of police misconduct.

At a time when the Police Department was not only found by the DOJ to be engaging in "a

pattern and practice of conduct that violates the First, Fourth, and 14th Amendments of the

Constitution as well as federal anti-discrimination laws,"[16] but also is having to answer for the

criminal behavior some of its officers who planted drug evidence,[17] shining a light on the

misconduct that is rampant in the Police Department is imperative to hold officers accountable.

Gagging victims of police misconduct, such as Ms. Overbey, is a veil to avoid accountability.

---

[16]  U.S. Dep't of Justice, *supra* note 2.

[17]  Justin Carissimo, *34 Baltimore cases dismissed after video appears to show officer planting drugs*, CBS News (July 29, 2017), *available at* https://www.cbsnews.com/news/body-cam-video-baltimore-police-department-officer-planted-drugs-cases-dropped/.

Furthermore, the gag order is unconscionable given the superior bargaining power of the City.  The specific circumstances that give rise to this action must be considered in order to determine the egregiousness of the disproportionate bargaining power that the City had over Ms. Overbey.  *See Spradlin v. City of Owasso*, No. 12-CV-497-JED-FHM, 2014 WL 1664974, at *4 (N.D. Okla. Apr. 25, 2014) (considering the circumstances surrounding the signing of the contract to determine the voluntariness to enter into an agreement).  The City understands the clear imbalance in bargaining power and regularly inserts gag orders in their settlement agreements, knowing that those they are settling with do not have the means to engage in protracted legal battles over the violation of their rights.  Further, the gag order was not reasonably limited:  it only applied to Ms. Overbey and not the City; it extended for an indefinite period of time; and she did not fully understand the nature of the gag order.  *See Nucor Corp. v. Bell*, 482 F. Supp. 2d 714, 728 (D.S.C. 2007) (requiring that in order comply with public policy, valid restraints on activities after termination from employment must be reasonably limited).  The unilateral nature of the gag order, given the unbalanced bargaining power of the City, directly led to Ms. Overbey's depiction in the media as someone undeserving of just compensation for being brutalized by the Police Department.  The *Baltimore Sun* published an article that quoted City officials blaming Ms. Overbey for what happened to her, knowing full well she could not meaningfully respond.  Incomplete descriptions of the circumstances of Ms. Overbey's case affirmatively mislead the public about the misconduct that occurred, and twist the truth to paint a picture of the Police Department that is divorced from reality.

**B.      The Settlement Contains an Unenforceable Liquidated Damages Provision**

In Maryland, a purported liquidated damages provision will only be found lawful and enforceable if the amount is "reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise

obtaining an adequate remedy." *Lee Oldsmobile v. Kaiden*, 32 Md. App. 556, 562, 363 A.2d. 270, 274 (1976).  The fundamental purpose of a valid liquidated damages provision is to provide a reasonable measure of compensation in the event of a breach where, at the time the provision is agreed to, the damages are indeterminable or will be otherwise difficult to prove.  *Willard Packaging Co., Inc. v. Javier*, 169 Md. App. 109, 122, 899 A.2d 940, 947 (2006).  In deciding whether the parties to the purported liquidated damages provision truly intended for the amount specified to be a reasonable estimate of the likely damages that would flow from a breach, courts look to the "circumstances surrounding its execution."  *Id.* at 126, 899 A.2d at 950.

Maryland Courts have held that the burden of showing the enforceability of a liquidated damages clause is upon the party seeking to enforce the clause.  *See id.* at 128, 899 A.2d at 951 (explaining that the burden is on the party seeking to sustain a liquidated damages penalty to show it was incorporated intelligently to fix a measure of damages).  The burden of proof is therefore upon the City in this case, who are seeking to enforce the liquidated damages clause. The City must show that the amount set forth in the Settlement Agreement, at the time the parties executed the Agreement, was a reasonable forecast of their damages in the event of a breach, and that the damages in the event of a breach were difficult to forecast.  The City has not met its burden, as it has failed to demonstrate that the damages claimed by the City bear a relation or connection to any forecast of injury or otherwise compensable expectancy damages.  Fifty percent of Ms. Overbey's settlement sum is not a fair determination of possible injury to the City; rather it is an arbitrary percentage the City has included in the Settlement Agreement without any explanation of why it is a proper measure of expected damages.  The City has completely failed to point to any facts in the record that show fifty percent of Plaintiff Overbey's

settlement was a reasonable estimate of anticipated loss in the event of breach—let alone reasons that the Court still might reject as unreasonable, as it did in *Willard Packaging Co.*

Rather than demonstrate why half of Ms. Overbey's settlement sum is a reasonable estimate of the likely damages that would flow from her alleged breach, as the law requires, the City simply contends that the liquidated damages provision is not unlawful because it was subject to negotiation and reflects the inherent difficulty of proving the amount of harm resulting from Ms. Overbey's undisputed breach.  This argument is unpersuasive.  The City provides no evidence that the parties even discussed—let alone negotiated—the liquidated damages clause.  The circumstances surrounding the execution of the Agreement indicate that the opposite is true.  The City was a sophisticated party who presented Plaintiff Overbey with a standard "take it or leave it" agreement containing oppressive, non-negotiable terms.  The City's reliance on the difficulty of proving the amount of harm is also unavailing.  The standard set forth in *Willard* and consistently followed in Maryland courts recognizes that actual damages may be difficult to prove, but requires that the proponent demonstrate that the stipulated damages represent a reasonable estimate of the likely damages that would flow from a breach.  The City has failed to do so, providing only a conclusory assertion that "reputational harm" to the City and Officers could easily exceed the full settlement sum.

Maryland courts do not favor liquidated damages clauses where unequal bargaining power exists.  As discussed above, a number of material issues of fact remain with respect to whether the liquidated damages is a result of a true arms-length negotiation between two parties.  As such, the City must clearly show that the amount assessed was in fact a reasonable estimation of its damages.  If there is any doubt as to whether the clause functions as a liquidated damages clause or as a penalty clause, it must be found to be punitive, and therefore unenforceable.

34

*Goldman v. Connecticut Gen. Life Ins. Co.*, 251 Md. 575, 248 A.2d 154 (1968).  Clear doubt is present in this case as the City has not set forth any facts to demonstrate the reasonableness of the liquidated damages provision.  As such, it is unenforceable as a penalty.

### C.     It Is Premature To Dismiss the Baltimore Police Department from This Case

The Police Department's separate motion should be denied because it is based on the mistaken premise that liability stems from a breach of the Settlement Agreement, to which it was not a party.  But while Ms. Overbey does raise a claim for breach against the City, the claims against the Police Department stem entirely from its gag order policy that—as discussed above—violates both the First Amendment and Maryland public policy.  Thus, the Police Department's liability has nothing to do with whether it was a party to, or beneficiary of, the Settlement Agreement, so the bulk of the argument put forward by the Police Department is irrelevant.

Furthermore, whether the gag order policy that is the central focus of the complaint is properly attributable to the City, the Police Department, or both, is a question of fact that is not suitable for adjudication on a motion to dismiss.  Plaintiffs' principal objective in filing this lawsuit is judicial relief in the form of an order from this Court declaring the gag order policy to be unlawful under the First Amendment, Maryland public policy, or both.  Based on information and belief, both the City and the Police Department have some responsibility for the unlawful policy, as alleged in the complaint.  *See* Compl. ¶ 19–21.  Discovery may demonstrate something different, but it is premature to say.  The very fact that the Police Department filed its own motion with separate legal counsel indicates that it is a separate entity from the City.  Accordingly, the Police Department's motion must be denied.

### CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request this Court deny Defendants' motions to dismiss or alternatively for summary judgment.

September 1, 2017                         Respectfully submitted,


                                         /s/ *Daniel Wolff*
                                         Daniel Wolff (No. 19940)
                                         Benjamin C. Wastler
                                         Nkechi Kanu
                                         Tyler O'Connor
                                         CROWELL & MORING LLP
                                         1001 Pennsylvania Avenue, N.W.
                                         Washington, D.C. 20004
                                         dwolff@crowell.com
                                         bwastler@crowell.com
                                         nkanu@crowell.com
                                         toconnor@crowell.com
                                         Telephone: (202) 624-2500
                                         Fax: (202) 628-5116

                                         *Attorneys for Plaintiffs Ashley Overbey and
                                         Baltimore Brew*

OF COUNSEL

Deborah Jeon (No. 06905)
Nicholas Steiner (No. 19670)
ACLU of Maryland
3600 Clipper Mill Rd, Suite 350
Baltimore, MD 21211
Telephone: (410) 889-8555
Fax: (410) 366-7838
jeon@aclu-md.org
steiner@aclu-md.org

36

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Plaintiff's Answer to

Defendants' Motions to Dismiss and Alternatively the Mayor and City Council of Baltimore's

Motion for Summary Judgment and to Strike Jury Demand has been served via the CM/ECF

electronic filing system on this 1st day of September, 2017, upon all parties of record:


/s/ *Daniel Wolff*
Daniel Wolff (Attorney of Record)
dwolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
Telephone:     (202) 624-2500
Facsimile:     (202) 628-5116