IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ASHLEY AMARIS OVERBEY, et al.          *

                                       *

          Plaintiffs
                                       *

          vs.                          CIVIL ACTION NO. MJG-17-1793
                                       *

THE MAYOR AND CITY COUNCIL
OF BALTIMORE, et al.
                                       *

          Defendants

*         *         *         *         *         *         *         *         *

MEMORANDUM AND ORDER

          The Court has before it the Motion to Dismiss of Baltimore

Police Department [ECF No. 10], Defendant Mayor and City Council

of Baltimore's Motion to Dismiss or for Summary Judgment and to

Strike Jury Demand [ECF No. 11], and the materials submitted

relating thereto.  The Court has held a hearing and has had the

benefit of arguments of counsel.


I.   Background

     A. Procedural History

          The instant case, filed June 30, 2017 [ECF No. 5] pertains

to the settlement of a police brutality claim that Plaintiff

Ashley Overbey ("Overbey") asserted against the Mayor and City

Council Of Baltimore ("the City").  The underlying case was

settled when Overbey and the City entered into a settlement

agreement that was approved by the City's Board of Estimates on September 10, 2014.  <u>See</u> Settlement Agreement and Release ("Agreement"), Def.'s Mot. Ex. 3, ECF No. 11-4.

Overbey now alleges that, in regard to the Agreement, the City of Baltimore unlawfully penalized her protected speech rights and breached the Agreement.  She seeks to challenge the validity of the non-disparagement clause in the Agreement as violative of Maryland public policy.  Plaintiff Baltimore Brew, an independent daily news website, challenges the non-disparagement clause as a violation of Maryland public policy and alleges that the non-disparagement clause in the Agreement impinges on its right to a free press.

Defendants Baltimore City Police Department ("BPD") and the Mayor and City Council of Baltimore ("the City") filed motions to dismiss on July 27, 2017 [ECF Nos. 10 and 11, respectively]. By Order of October 4, 2017 [ECF No. 25], Judge Motz granted the dismissal motions and entered judgment in favor of Defendants. On October 13, 2017, Chief Judge Bredar reopened the case as to Plaintiff Baltimore Brew by Order [ECF No. 26].

On October 31, 2017 the undersigned Judge held a teleconference with the parties and requested that the Plaintiffs file a motion to reconsider so that all pending issues may be adjudicated.  Following the teleconference, the Court issued a Procedural Order [ECF No. 28] stating that

"[u]pon the filing of Plaintiffs' motion to reconsider, the Court will consider all issues presented by the aforesaid dismissal motions."  On November 2, 2017, Plaintiffs filed the requested motion [ECF No. 29].

A hearing in this case regarding all issues presented by Defendants' motions was held on November 16, 2017.

### B. Alleged Facts

Plaintiffs alleged in the Amended Complaint ("AC") that between 2009 and 2017, the City of Baltimore paid more than 33.4 million dollars "in settlements and court judgments for lawsuits alleging brutality and other police misconduct."  AC ¶ 28. About 95% of these settlements contain a non-disparagement clause.  AC ¶ 19.  Plaintiff Overbey, a police brutality claimant, was a party to one of these settlement agreements.  AC ¶ 53.  Plaintiff Baltimore Brew alleges that these settlements agreements have "severely limited [its] ability to fully and accurately report on the issue of police brutality and abuse of power in Baltimore."  AC ¶ 76.

The AC contains allegations regarding the substance of Plaintiff Overbey's police brutality claim, set against the backdrop of many recent police brutality cases in Baltimore City.  On April 30, 2012, around 9:40 PM, Overbey contacted the BPD to report a burglary.  AC ¶ 33.  Allegedly, police arrived

3

in response to her call and, without provocation, several of the officers became violent towards her: they "grabbed [her] by her hair, twisted her arm behind her back, and violently slapped and punched her," "violently and maliciously beat[] [her] with clenched fists" causing eye injury, struck her with a Taser, "restrained her and cut off her airway by placing [a] knee on her throat," and finally arrested her.  AC ¶¶ 37-44.

Overbey, through an attorney, filed a Complaint in the Circuit Court for Baltimore City against the City and the officers, alleging false arrest and false imprisonment, battery, violation of the Maryland Declaration of Rights, and malicious prosecution.  She pursued pretrial proceedings for approximately two years before she was presented with the Agreement.  AC ¶¶ 46-48.

Pursuant to the Agreement, the City agreed to pay Overbey $63,000 "within sixty (60) days of the approval of this Agreement by the Baltimore City Board of Estimates."  Agreement § 2, ECF No. 11-4.  The Agreement included Section 9, entitled "Non-Disparagement/Limitation on Public Statements," which states:

> It is understood and agreed by the Settling
> Parties that in exchange for the payment of
> the Settlement Sum by the Released Parties,
> the Releasing Party and that party's agents,
> representatives and attorneys shall strictly
> refrain from and avoid any attempt at
> defaming and/or disparaging the Released

4

Parties, including each of the Released
Parties' employees or agents regarding any
matter related to, or arising from the
Litigation or the Occurrence. Further, in
exchange for the payment of the Settlement
Sum by the Released Parties and because the
allegations of the Occurrence and Litigation
are disputed, the Settling Parties agree
that the Releasing Party and his or her
agents, representatives and attorneys, shall
limit their public comments regarding the
Litigation and the Occurrence to the fact
that a satisfactory settlement occurred
involving the Parties. It is understood and
agreed by the Settling Parties that this
limitation on public statements shall
include a prohibition against discussing any
opinions, facts or allegations in any way
connected to the Litigation or the
Occurrence, or substance of any prior
settlement offers or discussions with the
news media, except that the Releasing
Party's counsel may indicate that the
Litigation has been settled to avoid the
cost, time, expense and uncertainties of
protracted litigation.

The Settling Parties agree and understand
that a breach of the obligations set forth
in this Paragraph 9 is deemed by the
Settling Parties to be a material breach of
this Agreement for which the City is
entitled to a refund of fifty percent (50%)
of the Settlement Sum ($31,500.00) from the
Releasing Party. The remainder of the
Settlement Sum and all other obligations of
this Agreement shall remain in force. If it
is necessary for the City to pursue recovery
in litigation of the refund it is entitled
to under this paragraph, the City will be
entitled to recover all reasonable
attorney's fees, costs and expenses of such
litigation from the Releasing Party.

Agreement § 9, ECF No. 11-4.

Overbey had been represented by counsel during the negotiation of the Agreement, and signed the Agreement upon advice of counsel in August 2014.  AC ¶¶ 52-53.  She alleges that she misunderstood Section 9 to bind <u>both</u> her and the City, and to only prohibit her from speaking to the media (and not to the public at large).  AC ¶ 54.

Overbey received her settlement funds on October 8, 2014. AC ¶ 64.  However, before that date, The Baltimore Sun published a story about her case, including her mug-shot photo and her settlement amount.  AC ¶ 59.  Overbey became upset after reading the Sun story and corresponding reader comments, and responded to them:

> "I am the woman who this article is talking about AND THE POLICE WERE WRONG!! This article doesn't come close to WHAT REALLY HAPPENED or tell how three men over 200 lbs. each beat me (115 lbs) bruises all over my body a black eye AND tased twice all in front my 2 yr old daughter so before you decide to put ur MEANINGLESS opinion in on something FIND OUT THE FACTS FIRST! IF I were wrong my charges wldntve ben thrown out and i wldntve received a dime. Its people like you who make this cite the ****it…"
>
> "AND THIS WAS ALL AFTER I CALLED THEM FOR HELP AFTER MY HOME HAD BEEN BURGULARIZED WHILE I WAS AT WORK!! SO ANYONE WHO HAS ANYTHING TO SAY (NEGATIVITY) YOU CAN TAKE UR OPINION AND SHOVE IT!!"
>
> "I pay my taxes and support myself like everyone else but unlike a lot of other people I KNOW MY RIGHTS and I refused to let them get away with this AGAIN!!"

6

AC ¶ 63.  The City determined that these comments violated the Agreement's Section 9 Non-Disparagement/Limitation on Public Statements and withheld payment of one-half of the $63,000 settlement.  AC ¶ 64.  Thus, on October 8, 2014, Overbey received a check from the City in the amount of $31,500, which is half of the $63,000 agreed settlement amount.  Id.  The accompanying letter stated that she was only receiving half of the agreed-upon amount because of her above public comments regarding The Baltimore Sun article.  Id.

II.   The Motions and Standards of Review

   A.   The City's Motion for Summary Judgment

   The City has filed a motion to dismiss, or in the alternative a motion for summary judgment, and has submitted materials in addition to the Complaint regarding these motions. [ECF No. 11].  The Court has not excluded these materials from consideration.

   When "matters outside the pleading are presented to and not excluded by the court, the [12(b)(6)] motion shall be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d); Laughlin v. Metro. Washington Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998).  Because the Court has relied upon supplemental affidavits and documents filed outside of the

pleadings, it will treat the pending motion as a motion for summary judgment.

A motion for summary judgment shall be granted if the pleadings and supporting documents "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

The well-established principles pertinent to summary judgment motions can be distilled to a simple statement:  the Court may look at the evidence presented in regard to a motion for summary judgment through the non-movant's rose-colored glasses, but must view it realistically.  After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law.  See, e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  Thus, in order to defeat a motion for summary judgment, "the party opposing the motion must present evidence of specific facts from which the finder of fact could reasonably find for him or her." Mackey v. Shalala, 43 F. Supp. 2d 559, 564 (D. Md. 1999) (emphasis added).

When evaluating a motion for summary judgment, the Court must bear in mind that the "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  Celotex, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

### B. The BPD's Motion to Dismiss

The BPD's Motion is styled as a motion to dismiss the Complaint, on the basis that it is not a proper defendant in the action.

A motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. A complaint need only contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted).  When evaluating a 12(b)(6) motion to dismiss, a plaintiff's well-pleaded allegations are accepted as true and the complaint is viewed in the light most favorable to the plaintiff.  However, conclusory statements or "a formulaic recitation of the elements of a cause of action will not

9

[suffice]."  Id.  A complaint must allege sufficient facts "to cross 'the line between possibility and plausibility of entitlement to relief.'"  Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Twombly, 550 U.S. at 557).

Inquiry into whether a complaint states a plausible claim is "'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  Id. (quoting Twombly, 550 U.S. at 557).  Thus, if "the well-pleaded facts [contained within a complaint] do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (alteration in original)).

III.  DISCUSSION

    A.  Dismissal of Claims Against the BPD

The BPD argues that the entire case should be dismissed against it because it is not the proper party to the lawsuit. Def.'s Mot. Dismiss at 2, ECF No. 10-1.  The BPD "was not named as a defendant" in Overbey's underlying civil lawsuit, "did not appear in that case, and is not a party to the Settlement Agreement."  Id.  Nor is the BPD a third-party beneficiary to the contract.  Id. at 5.  Rather, the BPD argues, Plaintiff's in the instant case, "alleged causes of action are based entirely

10

on the conduct and practices of Baltimore City," and the only
reference to the BPD in the Amended Complaint is in the
background discussion regarding the history of police brutality
in Baltimore.  Id. at 3.

In response, Plaintiffs argue that it is too early for the
Court to make a decision as to whether the BPD is properly in
the lawsuit, and that they need more discovery to make that
determination.  Pl.'s Opp. at 35, ECF No. 18.  Plaintiffs seek
to have the Court defer decision on the BPD's motion.

The Court finds that there is no showing that additional
discovery would potentially support Plaintiff's position that
the BPD is properly named as a defendant in the lawsuit.  The
BPD is not a party to the Agreement and is not alleged to be a
third-party beneficiary of the Agreement.  Parties may not be
held to a contract to which they are not a party or a third-
party beneficiary.  See Cecilia Schwaber Tr. Two v. Hartford
Acc. & Indem. Co., 437 F. Supp. 2d 485, 489 (D. Md. 2006) (Under
Maryland law, "[a]s a general rule, 'a contract cannot be
enforced by or against a person who is not a party to it.'").

Moreover, Plaintiffs have not alleged any facts connecting
the BPD to the Agreement or to the City's policy of entering
into these types of settlement agreements.  They simply state in
a conclusory matter that the BPD, along with the City, has "some
responsibility for the unlawful policy."  Pl.'s Opp. at 35, ECF

11

No. 18.  This does not provide allegations stating a plausible claim upon which relief from the BPD could be granted.

Accordingly, the BPD's Motion to Dismiss [ECF No. 10] the claims against it shall be GRANTED.


B.  <u>Baltimore Brew's Standing to Sue</u>

Defendants contend that Baltimore Brew does not have standing to bring this lawsuit because it has not alleged an injury-in-fact and because it "does not have a First Amendment right to access information that the parties to the Settlement agreement promised by contract to keep from the general public." Def.'s Mot. at 25, ECF No. 11-1.

To show standing, Baltimore Brew "must demonstrate (1) an 'injury in fact'; (2) a 'causal connection between the injury and the conduct complained of,' such that the injury is 'fairly traceable' to the defendant's actions; and (3) a likelihood that the injury 'will be redressed by a favorable decision.'"  <u>Benham v. City of Charlotte, N.C.</u>, 635 F.3d 129, 134 (4th Cir. 2011). To show an "injury in fact," the Plaintiff must have "'adduce[d] facts demonstrating that [it has] suffered an invasion of a legally protected interest,'" that is 'concrete and particularized' and 'actual or imminent,' rather than 'conjectural or hypothetical.'").  <u>Id.</u> at 135.

The press's access to information has been limited under the Supreme Court's First Amendment jurisprudence.  See, e.g., Cohen v. Cowles Media Co., 501 U.S. 663, 672 (1991) (The "First Amendment does not confer on the press a constitutional right to disregard promises that would otherwise be enforced under state law."); Branzburg v. Hayes, 408 U.S. 665, 684 (1972) (the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."); Associated Press v. Nat'l Labor Relations Bd., 301 U.S. 103, 132 (1937) ("The publisher of a newspaper has no special immunity from the application of general laws.").

Baltimore Brew alleges that it has reported "on BPD lawsuits and settlements involving allegations of police brutality" since the summer of 2011.  AC ¶ 68.  To report these stories, Baltimore Brew relies on (1) Board of Estimates' published agendas which include settled lawsuits above $25,000, and (2) the City's official memorandum for each settled lawsuit. AC ¶¶ 70-73.  Baltimore Brew alleges that these documents are one-sided and incomplete without the version of facts as alleged by the plaintiffs in the various lawsuits.  AC ¶ 75.  Because the non-disparagement clauses in the settlement agreements prevent the plaintiffs from discussing their cases, Baltimore Brew argues that the clauses impair its "ability to gather news and receive speech" about incidents of police brutality.  Pl.'s

Opp. at 27, ECF No. 18.  Specifically, the alleged injury is the "restriction of access to specific and essential sources of information–the victims of police brutality."  Id. at 26.[1]

However, Baltimore Brew has not shown that it was entitled to access the information at issue in the first place. Baltimore Brew is neither a party to the contract nor a third-party beneficiary to the contract.  It appears to be arguing that Overbey, as a party to the Agreement, had the right to ignore confidentiality clauses if a member of the press asked for information covered by that clause.

The Supreme Court's jurisprudence precludes a finding that the press has unrestricted access to any information they seek. See, e.g., Cohen, 501 U.S. at 669 ("the truthful information sought to be published must have been lawfully acquired."). Because Baltimore Brew was not entitled to the information at issue in the first place, it would not suffer a legally cognizable injury if Overbey agreed not to provide the information.

Plaintiff Baltimore Brew relies heavily on a Sixth Circuit case to argue that it has standing in this case.  See CBS Inc. v. Young, 522 F.2d 234, 237 (6th Cir. 1975).  Although it is likely true that news gathering qualifies for First Amendment

---

[1] Baltimore Brew does not allege that it has suffered injury due to self-censorship.  Pl.'s Opp. at 26, ECF No. 18.

protections, id., First Amendment protections are not absolute and may be curtailed under some circumstances, Cohen, 501 U.S. at 669.  Moreover, the CBS Inc. case is distinguishable at the very least because Baltimore Brew had access to Overbey's version of the facts as filed in her Civil Complaint, and could have interviewed Overbey prior to the Agreement.  The Plaintiffs in CBS Inc., on the other hand, were "effectively cut off from any access whatever to important sources of information about the trial."  CBS Inc., 522 F.2d at 237.

Finally, any Baltimore Brew argument that it sustained an alleged injury-in-fact from the combination of all of the settlements containing a similar disparagement clause does not constitute "concrete and particularized" injury as required by Benham, 635 F.3d at 134.[2]

Accordingly, the City shall be granted summary judgment on Baltimore Brew's claims.


C. Overbey's First Amendment Claims

Constitutional rights, including First Amendment rights, may be waived in a contract under certain circumstances.  See

_____

[2] At the motions hearing, Plaintiff Baltimore Brew indicated that it seeks discovery to find a settling party that did not voluntarily enter into a settlement agreement with a non-disparagement clause.  Hearing Rough Tr. 7:12-8:6.  However, this type of investigation should have been completed before the suit was filed because the names of all settling parties are matters of the public record.  Hearing Rough Tr. 17:15-24.

Lake James Cmty. Volunteer Fire Dep't, Inc. v. Burke Cty., N.C., 149 F.3d 277, 280 (4th Cir. 1998) (concluding that a contract requiring the fire department to waive its First Amendment right to petition the government was enforceable).  For such a waiver to be effective, it must be "knowing," "voluntarily given," and "must not undermine the relevant public interest."  Id. Regarding public interest, the "contract will be enforced unless the interest promoted by its enforcement is outweighed by the public policy harms resulting from enforcement."  Id.

Plaintiff Overbey was represented by an attorney during her civil lawsuit and during the negotiations of the Agreement.  She was advised by counsel to enter into the Agreement, and did so, despite some initial hesitations.  AC ¶ 53.  She was not coerced in any way to sign the agreement.  Therefore, the Court finds that her waiver was "knowing" and "voluntarily given."  See Lake James, 149 F. 3d at 280.

Overbey argues that the waiver should not be enforced because it "undermines the accountability and transparency that is necessary to the effective operation of the Police Department."  Pl.'s Opp. at 19, ECF No. 18.  However, it is by no means clear that preventing post-settlement discussions of police brutality cases would undermine the BPD's ability to commit to transparency and accountability, when other procedures exist to hold the BPD accountable for its actions.  See, e.g.,

USA v. Police Department of Baltimore, Consent Decree, JKB-17-99, ECF No. 2-2 (Jan. 12, 2017).  Whether additional procedures are necessary as a matter of public policy is not for this Court to decide.  Moreover, there are also public policy interests which are promoted by a enforcing a voluntary settlement agreement: e.g., reducing time and resources spent on litigation in courts and fostering confidence in negotiating future settlement agreements.  Thus, the Court finds that any existing public policy harms do not outweigh the interest in enforcing the contract.  See Lake James, 149 F.3d at 280.

To bolster her public policy argument, Plaintiff relies on a 9th Circuit case to argue that the waiver should be deemed unenforceable as a matter of public policy.  See Davies v. Grossmont Union High Sch. Dist., 930 F.2d 1390, 1398 (9th Cir. 1991).  In Davies, plaintiff's right to run for political office was restricted in a settlement agreement, which the Sixth Circuit invalidated because it "results in a limitation on the fundamental right to vote of every resident" under that jurisdiction.  Id.  There is a significant difference between waiving the right to run for political office and waiving the right to speak about the facts of a settled case.  Thus, the Court finds that Davies is readily distinguishable from the present case.

Overbey also argues that she did not understand the scope of the non-disparagement clause.  However, any alleged unilateral mistake or misunderstanding about the Agreement would not be a valid excuse from performance.  There is no allegation of fraud or inequitable conduct inducing any alleged misunderstanding.  Nationwide Mut. Ins. Co. v. Voland, 103 Md. App. 225, 234 (1995) ("We note that '[t]he law in this State is clear that, absent intentional, culpable conduct, such as fraud, duress or undue influence, a unilateral mistake is ordinarily not a ground for relief from a contract.'").  Overbey was represented by an attorney and had every opportunity to investigate the scope of the provision before she signed the Agreement.[3]

Finally, Overbey argues that the provision was a product of unequal bargaining power, for two main reasons.  First, because similar provisions are included in 95% of the settlement agreements, the "ubiquity of the provision suggests it is a non-negotiable component" of all agreements.  Pl.'s Opp. at 18, ECF

---

[3] At the hearing, Plaintiff Overbey argued that it was not clear that the Agreement was signed voluntarily after substantive negotiations, and that she needs further discovery.  See Hearing Rough Tr. 28:10-15 ("The fact is we don't know if there was a negotiation over the money.  We don't know if there was a negotiation over anything.").  This speculation does not constitute "specific facts" showing a genuine issue for trial. Anderson, 477 U.S. at 250.  See also id. at 249-50 ("If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted.").

No. 18.  Second, Plaintiff Overbey was "homeless and destitute" at the time and had no real option but to sign the contract. Id.

The Court recognizes the Plaintiff's difficult economic and social situation but does not agree with the contention that the non-disparagement obligation can be avoided.  This contract was not a contract of adhesion because there was ample opportunity for Overbey to negotiate its terms.  See Walther v. Sovereign Bank, 386 Md. 412, 430 (2005) ("A contract of adhesion has been defined as one 'that is drafted unilaterally by the dominant party and then presented on a 'take-it-or-leave-it' basis to the weaker party who has no real opportunity to bargain about its terms.'").

Typically, contracts of adhesion appear in consumer contract disputes in which the consumer signs a standard-form contract without the ability to negotiate about its terms. Walther, 386 Md. at 430.  Here, the Agreement itself was only eight pages long and the non-disparagement clause was not hidden in fine print.  Overbey was represented by counsel and could have decided to refuse the settlement and proceed to trial.  She could have leveraged her position to demand that the non-disparagement clause be removed from the contract.  The fact that these non-disparagement clauses are in the vast majority of agreements does not mean that they are non-negotiable clauses.

And the fact that Plaintiff Overbey was impoverished at the time and decided to settle her claim for a financial payment does not render the Agreement a contract of adhesion.

The Court recognizes that a plausible claim could exist in a different case with different facts.  However, Plaintiff Overbey has not presented any evidence showing any indication that her own contract negotiation was entered into involuntarily or somehow unfairly negotiated.  This is fatal to her claim.

Accordingly, Defendant Mayor and City Council of Baltimore's Motion for Summary Judgment as to Plaintiff Overbey's First Amendment claims shall be GRANTED.


    D.  Overbey's Contract Claims

Counts III, IV, and V of the AC assert contract claims.  In Count III, the AC alleges that the Agreement violates Maryland's public policy of "promot[ing] the disclosure of information related to the administration of state and local services," "impair[ing] the media from performing its vital role as government watchdog," and "playing off the victim's poverty." AC ¶¶ 97, 99, 101.  In Count IV, the AC alleges that the Agreement's liquidated damages provision is unlawful because it is excessive and has the effect of punishing Overbey for breaching the contract.  AC ¶¶ 105, 108.  In Count V, the AC alleges that the City breached the contract when it unilaterally

20

withheld half of the settlement amount owed to Overbey, instead of paying the full amount and then seeking a refund.  AC ¶¶ 110-113.

Even if these contract claims were meritorious, they are barred by the relevant statute of limitations.  In Maryland, a contract claim against the local government is barred "unless the claimant files suit within the later of 1 year after: (1) The date on which the claim arose; or (2) The date of completion of the contract that gave rise to the claim."  Md. Code Ann., Cts. & Jud. Proc. § 5-5A-01.

The Agreement was signed in August 2014 and approved by the City's Board of Estimates on September 10, 2014.  The City tendered payment of half of the settlement funds on October 8, 2014, which, according to the AC, constitutes a breach of the Agreement.  The original Complaint in the instant case was filed on June 29, 2017, substantially more than a year after the alleged breach.  ECF No. 1.

Accordingly, Defendant Mayor and City Council of Baltimore's Motion for Summary Judgment shall be GRANTED as to Counts III, IV, and V.

E.   Motion to Stirke Jury Demand

Because there are no more pending claims for jury trial, the City's Motion to Strike Jury Demand is moot.

IV.   <u>Conclusion</u>

For the foregoing reasons:

1. The Motion for Reconsideration [ECF No. 29] is GRANTED
   and all claims have now been adjudicated.

2. The Motion to Dismiss of Baltimore City Police
   Department [ECF No. 10] is GRANTED.

3. Defendant Mayor and City Council of Baltimore's Motion
   for Summary Judgment and to Strike Jury Demand [ECF
   No. 11] is GRANTED.

4. All claims are dismissed against all Defendants.

5. Judgment shall be entered by separate Order.


    SO ORDERED, this <u>Tuesday, November 28, 2017</u>.



                          _____/s/_____
                           Marvin J. Garbis
                      United States District Judge